**DORCHESTER GAS PRODUCING COMPANY, Damson Oil Corporation, and Damson Master Limited Partnership, Appellants,**

v.

**Lawrence R. HAGY, Appellee.**

No. 07–87–0071–CV.

Court of Appeals of Texas, Amarillo.

March 10, 1988.

Appellants' Motion for Rehearing Granted in Part and Denied in Part; Appellee's Motion for Rehearing Denied April 26, 1988.

Scott, Douglass & Luton, Tom W. Reavley, Steve Selby and Ray Donley, Austin, for appellants.

Culton, Morgan, Britain & White, Patrick D. Long and William A. Hill, Amarillo, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellants Dorchester Gas Producing Company, Damson Oil Corporation, and Damson Master Limited Partnership appeal from a judgment in favor of appellee Lawrence R. Hagy for breach of a contractual price escalation provision by underpayment to appellee for royalties on the production of gas. In five points, appellants argue that the trial court erred in entering judgment for appellee because (1) as a matter

of law, appellee is not entitled to participate in appellants' price increase under the unambiguous terms of the supplemental agreement; (2) there is no evidence, or insufficient evidence, to support the jury finding that the original parties to the supplemental agreement intended the price escalation provision to be triggered as a result of Federal Power Commission Order 749; (3) appellee's action as to gas sales prior to 1981 is barred by the four year statute of limitations; (4) appellee knew, or should have known, by the exercise of reasonable diligence, that he was underpaid, as a matter of law; and (5) appellants should have been allowed to submit evidence on their estoppel defense. In one cross-point, appellee says he was underpaid in the amount of $4,999,186.76. We reform the amount of damages and prejudgment interest awarded in the judgment to comply with the jury verdict and, as reformed, affirm the judgment.

On October 1, 1949, appellee assigned to Panoma Corporation, appellants' predecessor in interest, his undivided interest in approximately 50,000 acres of oil and gas leases located in Carson and Gray Counties, Texas. By this instrument, appellee reserved an overriding royalty in all of the assigned leases. Paragraph 3 provided that appellee's royalty would be his proportionate share of a fixed price starting at 5 cents per mcf and decreasing over time to 4¼ cents per mcf. He was insured a fixed royalty that would not be affected by either increases or decreases in Panoma's price.

The October 1 contract was amended by a Supplemental Agreement dated October 2, 1949. That agreement permitted appellee to share in all price increases received by Panoma resulting from either voluntary contract change or any regulatory order. Paragraph 1 provided:

It is expressly provided that, should Northern Natural Gas Company, its successors or assigns, voluntarily increase the price paid Panoma for gas delivered under said Northern Contract above the presently specified contract price of Five and One-fourth Cents (5¼ cents) per

thousand cubic feet, or should Panoma at any time, or from time to time, hereafter receive a higher price for said gas marketed from the assigned leaseholds as the result of any present or future valid law or any present or future lawful order of any regulatory body, State or Federal, then, and in such event, the overriding royalty rate hereinabove specified shall be increased by an amount equal to the difference between said contract price of Five and One-fourth Cents (5¼ cents) and such higher net price per thousand cubic feet which Panoma currently receives from month to month....

This October 2 agreement was cancelled and superceded by the Supplemental Overriding Royalty Agreement dated October 4, 1949. This is the agreement on which appellee bases his claim. The October 4 Supplemental Agreement limited appellee's right to participate in price increases to those increases that result from minimum price orders. Paragraph 1 provided that if Panoma's price increased above 5¼ cents per mcf (the price that was being received as of October 1949 under a 1947 contract between Panoma and Northern Natural Gas Company) as a result of any state or federal order imposing a minimum wellhead price, then appellee would share in the increased price. The full text of Paragraph 1 is as follows:

It is understood and agreed that in the event Panoma shall hereafter receive a higher price for gas marketed from said assigned leasehold interests than the Five and One-fourth Cents (5¼ cents) per thousand cubic feet presently provided in said Northern contract as the result of any present or future valid law or any present or future lawful order of any regulatory body, State or Federal, which shall validly establish a minimum wellhead price for gas produced from said leaseholds in excess of said contract price presently received, then and in such event, the overriding royalty rate set forth in Paragraph numbered [sic] 3 of the aforesaid Overriding Royalty Contract shall be increased by an amount equal to the difference between said contract price of Five and One-fourth Cents

(5¼ cents) and such higher net price per thousand cubic feet which Panoma currently receives from month to month as the result of such law or order. The term "net price" as used herein shall mean the price received by Panoma per thousand cubic feet of gas (after proper adjustment for any different basis of measurement or unit of volume than that specified hereunder) less any increased, new or additional production, severance or other taxes hereafter imposed on Panoma, and less any increased royalty paid lessors, or any other increased costs or expenses of whatever nature Panoma must assume and bear with respect to such gas as the result of the increased price established by such law or order.

Paragraph 3 of the Supplemental Agreement provided, however, that Panoma reserved the right to amend or replace its contract with Northern Natural and that any price increase or decrease resulting from a new gas contract or contract amendment would not affect appellee's royalty. Paragraph 3 reads as follows:

Assignor agrees that Panoma shall have the right to terminate or amend, revise or supplement said present Northern contract as to any of its provisions and to include additional lands thereunder, or enter into a new contract or contracts providing a different price and other terms and conditions in lieu thereof with Northern or other purchasers covering the sale of gas from said assigned leasehold interests and such other leaseholds, acreage or interests which Panoma may include therewith, and in such event it is mutually agreed and understood that rate of overriding royalties payable to Assignor as set forth herein and in the aforesaid Overriding Royalty Contract shall continue in force and effect and shall not be modified, increased or diminished should Panoma hereafter enter into any such revised or new contract or contracts containing price, measurement, or other provisions different from those set out in said present Northern contract.

Panoma negotiated a contractual price increase with Northern Natural in 1952 which replaced the 1947 contract. It set a new contract price at 8 cents per mcf and provided for negotiable price escalations every five years, or arbitration if negotiations did not reach an agreeable price. On December 31, 1975, the Federal Power Commission issued its Opinion No. 749 (hereinafter FPC 749) establishing a minimum wellhead price for gas being sold for resale in the interstate market, which was in excess of the amount being received by appellee. Opinion 749 also established a maximum lawful price for gas produced from old vintage wells.

Appellants concede in their reply brief that their contract price was capped, and thus, affected by, the ceiling regulations of FPC 749. Appellee argues that since both ceiling regulations and minimum price regulations were included in FPC 749, the contract price was increased "as a result of" FPC 749, and thus, payments under his overriding royalty interest should have increased.

The question of the intent of the parties to the October 4, 1949 Supplemental Overriding Royalty Agreement was presented to the jury, which found an intent for a regulating order, such as FPC 749, to trigger the escalation provision. The jury found that appellee had been underpaid under the escalation provision since January 1, 1976, $1,509,962.72, and $607,779.75 since January 1, 1981, based on figures provided by appellee's witness. That evidence was uncontroverted. The witness testified that those amounts were computed on appellee's pro rata share of the minimum wellhead price established under FPC 749, although appellants actually received, by their contract with Northern Natural, the maximum price allowed by FPC 749. The court rendered judgment for $1,217,-403.33 for underpayment to appellee during the period July, 1976 to April, 1986, $17,-086.22 for underpayment since May 1, 1986 to date of judgment, and $474,171.94 as prejudgment interest. The court also rendered judgment on the attorney's fees to both sides found by the jury to be reasonable.

In their first point, appellants argue that appellee is not entitled to participate in their price increases under the unambiguous terms of the 1949 Supplemental Agreement. In their second point, they argue, in the alternative, if the contract provision is found to be ambiguous, there was no evidence, or insufficient evidence, to support the jury finding that the parties intended for the price escalation to be triggered as a result of FPC 749.

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument, *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *R & P Enterprises v. La Guarta, Gavrel & Kirk*, 596 S.W.2d 517, 518 (Tex.1980), rather than the understanding of a hypothetical reasonable and prudent person. *Whataburger, Inc. v. Rutherford*, 642 S.W.2d 30, 32 (Tex. App.—Dallas 1982, *writ ref'd* n.r.e.). To achieve this objective, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous and the court will construe the contract as a matter of law. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Universal C.I. T. Credit Corp. v. Daniel*, 243 S.W.2d at 157; *Seaman v. Seaman*, 686 S.W.2d 206, 211 (Tex.App.—Houston [1st Dist.] 1984, *writ ref'd* n.r.e.). A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker v. Coker*, 650 S.W.2d at 393; *Seaman v. Seaman*, 686 S.W.2d at 211. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker v. Coker*, 650 S.W.2d at 394.

Appellee testified that it was his intent to retain the economic benefit of the gas being assigned to Panoma. He stated that Paragraph 1 of the Supplemental Overriding Royalty Agreement was intended to protect him if Panoma or its successor realized a higher price as a result of federal price regulations which established a minimum wellhead price for gas and that the increase in the minimum prices payable under FPC 749 should entitle him to a proportionate increase in his royalties. He agreed that Paragraph 3 provided that Panoma had the right to amend the Northern contract without his consent, and that his interest would not be affected thereby, although such testimony contradicted his earlier deposition testimony that he was to receive an increased royalty if the price went up for any reason. He admitted on cross-examination that he filed corrections to his deposition testimony with the court prior to trial, indicating his "realization" that the two paragraphs provided for an increase in his royalty only if the increase was due to regulatory action. He stated that he reviewed the documents in question after the deposition, and refreshed his memory of the events and, thus, had filed the corrections to his deposition testimony which now complied with his trial testimony of his recollection of the events surrounding the drafting of the Supplemental Overriding Royalty Agreement.

Appellants, on the other hand, argue that Paragraphs 1 and 3 serve to limit appellee's right to increased royalty to price increases "as a result of" a regulatory order which establishes a minimum wellhead price. They argue that their price increased "as a result of" their negotiations with Northern Natural. They contend FPC 749 only capped their price. Thus, they argue, they did not actually receive a price increase as a result of FPC 749.

It is apparent from a reading of the paragraphs in question, that the contract is reasonably susceptible to more than one meaning. That conclusion is strengthened by the force of each side's argument as to the meaning of those paragraphs. Therefore, it is ambiguous and we must look elsewhere for the true meaning.

■ Generally, if a written instrument is susceptible of more than one meaning, extraneous evidence is admissible to determine the instrument's true meaning. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d at 519; *Netherland v. Wittner*, 662 S.W.2d 786, 788 (Tex.App.—Houston [14th Dist.] 1983, *writ ref'd n.r. e.*).

■ The court, in order to ascertain the true intentions of the parties, should consider the circumstances existing when the contract was executed and would generally follow the interpretation of the parties to the contract. *Lone Star Gas Co. v. X-Ray Gas Co.*, 139 Tex. 546, 164 S.W.2d 504, 508 (1942); *Harrison v. City of San Antonio*, 695 S.W.2d 271, 276 (Tex.App.—San Antonio 1985, *no writ*). Great, if not controlling, weight should be given by the court to the interpretation placed upon the contract of uncertain meaning by the parties themselves. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex.1979). The court should adopt the construction of the instrument as placed upon it by the parties unless there is clear language in the instrument indicating an intention to the contrary.

■ Additionally, a writing is generally construed most strictly against its author and in such a manner as to reach a reasonable result consistent with the apparent intent of the parties. *Temple-Eastex Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex.1984). Appellants' predecessor in interest, Panoma, drafted the instrument in question and it shall be construed most strictly against them.

Appellee testified that it was his intent, and he believed, the intent of the other parties to the contract, appellants' predecessor in interest, to provide that appellee "retain the economic benefit of the gas" without incurring operating expenses. He testified that it was his intention that he would be entitled to a price increase when that price increase would be triggered by a regulatory order, such as FPC 749, *i.e.*, when a minimum wellhead price is established by regulatory order at an amount in

excess of the 5 cents per mcf established in the contract.

■ Appellee's testimony, if accepted by the jury, as it evidently was, was sufficient to support the jury finding that the original intent was that the price escalation provision be triggered by FPC 749. Appellants' first two points are overruled.

In their third point, appellants argue that appellee's damages based on gas sales prior to 1981 are barred by the four year statute of limitations. Tex.Civ.Prac. & Rem.Code Ann. sec. 16.004 (Vernon 1986). In their fourth point, appellants argue, alternatively, that appellee knew, or should have known by the exercise of reasonable diligence, that he was underpaid under the supplemental agreement, as a matter of law.

■ It is settled law in this state that limitation does not begin to run until the right or cause of action accrues. That right or cause of action does not exist until facts exist which authorize the person asserting the claim to seek relief in a court of competent jurisdiction from the person due to make reparation. It involves both the existence of the right and facts sufficient to constitute such a cause of action. *Williams v. Pure Oil Co.*, 124 Tex. 341, 78 S.W.2d 929, 931 (1935). The primary purpose of a statute of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds. These statutes are not directed to the merits of any individual case; they are a result of the legislative assessment of the merits of cases in general. *Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex.1977).

Recognizing the basic purpose of such statutes, on occasion when the courts have been presented with facts that justify its application, they have articulated what has come to be denominated as the "discovery rule." That rule provides that a statute of limitations does not begin to run from a fixed date, but from the time that a plaintiff knew or should have known of the existence of facts sufficient to constitute a cause of action. The supreme court has said that the rule is not really an extension of the limitation period "but is merely a recognition that in certain situations it is difficult if not altogether impossible to discover the existence of a legal injury." *Hays v. Hall*, 488 S.W.2d 412, 413 (Tex. 1972).

Thus, the rule is not a plea of confession and avoidance of the statute of limitations, but is the test to be applied in defining when a plaintiff's cause of action has accrued. *Weaver v. Witt*, 561 S.W.2d 792, 794 (Tex.1977). It has been rather extensively used in medical malpractice situations. *See, e.g., Hays v. Hall*, 488 S.W.2d at 412 (negligently performed vasectomy); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex. 1967) (foreign object left in patient's body); *Grady v. Faykus*, 530 S.W.2d 151 (Tex.Civ. App.—Corpus Christi 1975, writ ref'd n.r.e.) (excessive radiation). It has also been applied in numerous other types of situations. *See, e.g., Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984) (action for damage to land); *Langston v. Eagle Pub. Co.*, 719 S.W.2d 612, 615 (Tex.App.—Waco 1986, writ ref'd n.r.e.) (libel action); *Gifford v. Bank of the Southwest*, 712 S.W.2d 182, 184 (Tex.App.—Houston [14th Dist.] 1986, no writ) (breach of contract of bailment); *Miller v. Dickenson*, 677 S.W.2d 253, 257–58 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) (breach of implied warranty and DTPA action); *Padre Island Inv. Corp. v. Sorbera*, 677 S.W.2d 90, 94 (Tex.App.—San Antonio 1984, writ dism'd) (breach of express warranty).

Appellants recognize the discovery rule, but insist that it is not applicable in this case. They reason that this case is simply an action for breach of contract upon which limitations began to run at the time of the breach of the contract, *i.e.*, when royalties due under the contract were due and payable. Since Hagy filed suit on December 18, 1984, they argue, the statute would ban recovery from gas sales prior to December 18, 1980.

The only exception to the above rule, they contend, would be if appellee had pled and proved a fraudulent concealment of

facts which in law would take his cause out of the bar of the statute. In support of their argument, they place primary reliance upon *Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 144 Tex. 475, 191 S.W.2d 716 (1945). In that case, Luling sought recovery from Humble for money allegedly due because of Humble's failure to properly charge expenses and account for oil produced. The Court noted that the contract in question required Humble to furnish Luling within one month after the close of each calendar month, a statement of investments and expenses incurred and credits and receipts during each calendar month. By this provision, the Court said, the parties clearly intended a settlement of accounts within one month after the close of each calendar month. *Id.*, 191 S.W.2d at 720. It was against this background that the Court held that under the contract an action would simply be one for breach of a written agreement, and there was no reason why Luling could not have been advised fully and filed its suit within the limitation period. Because of that circumstance, and since Luling did not file its suit within the four year period, the Court held that it was "incumbent upon Luling either to allege a fraudulent concealment or facts which in law would take its cause of action out of the bar of the statute." *Id.* at 722–23. Because Luling was furnished a monthly detailed accounting showing how to arrive at the payments, the requisite for application of the discovery rule, *i.e.*, the difficulty of discovering a mistake or shortfall in computation of amounts due, did not exist.

In the case of *Andretta v. West*, 415 S.W.2d 638 (Tex.1967), the Court was faced with a situation more nearly analogous to that in the instant one. *Andretta* involved an action by the owner of a non-participating royalty interest to share in compensatory royalty payments made pursuant to an agreement between the lessee and the holder of the executive rights. In that case, the holders of the executive rights had executed an oil and gas lease in which the Superior Oil Company ultimately obtained the lessee interest. Superior had drilled a producing well on an adjoining tract. In order to resolve the question as to whether it was obligated to drill an offset well on the tract in question, Superior agreed to pay the holders of the executive rights on the tract " 'a lieu royalty in cash equivalent to one-eighth (⅛) of the proceeds from the sale of all oil produced and sold from' the well on the adjoining tract." *Id.* at 639. No part of that "lieu" royalty was ever paid to Andretta.

With regard to the question of limitation, the Court held that the owner of a non-participating royalty interest would not ordinarily learn of such an arrangement until he was advised by one of the parties. Using the analogy of the duty of a vendor to account to his vendee for rents collected by the vendor which would rightfully belong to the vendee, and of a co-tenant receiving rent from a third person for the use of the entire property to account to other tenants in common for their share of the rents, the Court concluded that the relationship between Andretta and the holders of the executive rights was of such a nature as to justify the imposition of the discovery rule. *Id.* at 642. In reaching that conclusion, the Court made no requirement of a prior allegation by Andretta of fraudulent concealment of pertinent facts.

█ In this case, in addition to the other instruments in evidence to which we have previously referred, there appears a copy of appellants' letter to "Royalty Owners and Other Interest Owners" dated September 10, 1976. That instrument stated that appellants "shall collect the new rates from Northern [based on contract price and the ceiling price established by FPC 749] and make royalty payment on the basis of said rates." Our examination of the instruments and the facts in this case lead us to the conclusion that the relationship of the parties is sufficiently analogous to that of the parties in the *Andretta* case as to justify the application of the discovery rule in this case. Moreover, and parenthetically, we note from the record that relevant evidence pertaining to the method of calculation was still available. That being the case, one of the primary reasons for strict imposition of a statute of limitations does

not exist in this case as the passage of time has not deprived appellants of essential evidence.

■ In support of their position that, as a matter of law, appellee knew or should have known he was being paid under the supplemental agreement, appellants advance two arguments. First, they say, appellee had in his possession at all times the documents necessary for him to know he was not being paid the FPC 749 minimum rate price for his gas. Second, they argue that there is no evidence to support the jury finding as to when appellee knew, or by the exercise of reasonable diligence should have known, of the underpayment by appellants. Appellee testified that he had read the Supplemental Overriding Royalty Agreement containing the pricing and escalation provisions in dispute. However, assuming that he was, therefore, charged with knowledge of its contents, regardless of the fact that he misplaced his copy until shortly prior to filing suit, his source of information as to how his royalty payments were actually being figured was the statements provided by appellants.

In that regard, we note the testimony of Jim Bob Lane and Leroy Savage that it was impossible from the stub furnished to appellee for payment of his royalty interest, to compute how his interest was determined without a "special formula" which only appellants knew. That being the case, there was no occasion for appellee to search the records or make inquiry of appellants when he did not know or have any reason to suspect that he was not being paid under the rate change imposed by FPC 749.

Appellants also argue that the jury's answer must be disregarded since it could only be based upon the jury's acceptance of appellee's position that he had lost his copy of the agreement and could not find it until shortly before suit was filed. To accept this position would be to speculate upon the mental processes of the jury. This we may not do. *Johnston Testers v. Rangel,* 435 S.W.2d 927, 933 (Tex.Civ.App.—San Antonio 1968, *writ ref'd* n.r.e.). This is particularly true in view of our holding above that

there is sufficient other evidence to justify the jury finding. Appellants' third and fourth points are overruled.

In their final point, appellants argue, alternatively, that the trial court erred in not allowing them to submit evidence on an estoppel defense. The excluded evidence was that appellee should be estopped in this action because he failed to call the breach to appellants' attention, and they relied on his silence to their detriment in a settlement with a third party. They argue, under *Champlin Oil & Refining Company v. Chastain,* 403 S.W.2d 376 (Tex.1965), that there was a fact question which should have been submitted to the jury.

■ The *Champlin Oil* Court held Chastain was put on notice by letter that Champlin was using a new formula and that unless he notified Champlin to the contrary, it would proceed upon the belief that Chastain agreed to the use of such formula. 403 S.W.2d at 384. Defendants' exhibit 10 in the present case, the letter to interest owners, did not contain such a requirement to notify appellants or suffer waiver of rights. *See Barfield v. Howard M. Smith Company of Amarillo,* 426 S.W.2d 834, 839 (Tex.1968). It did request the addressees to inquire if they had questions about the payment under the new rate. However, the essence of estoppel is a misrepresentation and appellee's silence in this case was not a representation of a material fact on which appellants could justifiably rely in negotiations with third parties. *Id.* Appellants' fifth point is overruled.

■ Appellee asserts a cross-point alleging that, as a matter of law, he was underpaid in the amount of $4,999,186.76. He argues that his overriding royalty interest is to be based on the net price received by appellants and not the minimum price established under FPC 749. The uncontradicted evidence, by appellee's witness, was that the amount of underpayment would be $1,509,962.72 if limited to the minimum rate set forth in FPC 749 and this was found in response to Issue No. 4 submitted to the jury. The witness testified to the higher figure as being proper based on the price actually received by appellants. The

jury chose not to accept the higher figure and there was sufficient evidence to support the jury's finding.

However, the court's judgment reflects recovery in the amount of $1,217,403.33 for the period July, 1976 to April, 1986; $17,086.22 from May 1, 1986 to date of judgment; attorney's fees as found reasonable by the jury and supported by the evidence; and prejudgment interest in the amount of $474,171.94. This Court notes that the figure used by the trial court for the period May 1, 1986 to date of judgment is the same as that found in appellee's Alternative Motion for Judgment. However, the trial court's figures for the period July, 1976 to April, 1986 and the prejudgment interest are not supported by the record, the jury's answer to special issues, nor are their methods of determination set out for our review.

Therefore, we affirm that portion of the judgment which awards attorney's fees found to be reasonable by the jury, and the $17,086.22 representing recovery for the period May 1, 1986 to date of judgment. We reform the judgment to comply with the jury's verdict which mandates that the proper recovery for the period July, 1976 to April, 1986 is $1,509,962.72 and prejudgment interest is $547,013.84. As reformed, the judgment is affirmed.

## ON MOTIONS FOR REHEARING

In their motion for rehearing, appellants assert five points of error. In the first of these points, they argue that this Court erred in reforming the judgment of the trial court to award an amount of damages equal to the amount found by the jury with accrued interest thereon. We find that point to be well taken and sustain it.

 It is axiomatic that a court of appeals may not modify or reverse a trial court's judgment in the absence of properly assigned error. *Texas National Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *Central Educ. Agency v. Burke,* 711 S.W.2d 7, 8 (Tex.1986); *Prudential Ins. Co. v. J.R. Franclen, Inc.,* 710 S.W.2d 568, 569 (Tex.1986); *Gulf Consol. Int'l Inc. v. Murphy,* 658 S.W.2d 565, 566 (Tex.1983).

In his cross-point, appellee did not attack the amount of damages and accrued interest awarded in the trial court's judgment per se but, instead, asserted that he had established, as a matter of law, his right to an award of $4,999,186.76 damages. Neither in his brief in argument under this point nor in oral argument did appellee otherwise attack the amount or method of computation of the damages awarded by the trial court in its judgment. We have, therefore, concluded that this cross-point is not sufficient to assign error to the amount actually awarded by the trial court or the method used by the trial court in computing that amount. Accordingly, after concluding that the amount of $4,999,186.76 was not established as a matter of law, the point was not sufficient to authorize any other modification of the trial court judgment. Therefore, as noted above, appellants' first point in their motion for rehearing is sustained.

Concomitantly, with its motion for rehearing, appellants filed a motion to supplement the transcript in this case by including a letter brief filed by appellee in the trial court in response to a motion by appellants to disregard certain special issues. Their allegation is that this brief is necessary to explain the method of computation used by the trial court in its calculation of the amount awarded in its judgment. Trial briefs are not properly part of the appellate transcript, and, moreover, the action now taken by us obviates any justification for the granting of that motion. The motion is, therefore, overruled.

We have carefully examined the other points of error raised by appellants in their motion for rehearing and remain convinced that, with the exception of the modification originally made by us, our disposition of the appeal is correct. Therefore, we overrule appellants' second through fifth points.

Appellee has also filed a motion for rehearing again asserting, as a matter of law, that he is entitled to damages in the amount of $4,999,186.76. We also overrule that motion for rehearing.

That portion of our original opinion calling for a modification of the damages and interest accrued thereon by the trial court is withdrawn and judgment will be entered affirming the judgment of the trial court.