**HOUSTON ENDOWMENT INC.
et al., Appellants,**

**v.**

**ATLANTIC RICHFIELD CO., Appellee.**

**No. 14–96–01581–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 2, 1998.

---

**33.** Robert E. Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas,* 13 TEX L. REV. 391, 418 (1935).

David J. Beck, Curt Webb, Linda K. McCloud, Jennifer Parker Ainsworth, Houston, for appellants.

Charles G. King, James P. Pennington, Houston, for appellees.

Before MURPHY, C.J., and HUDSON and SMITH,* JJ.

## OPINION

JACKSON B. SMITH, Jr., Justice (Retired).

Appellants, Houston Endowment Inc. and ten individuals and trustees (collectively, "HEI"), sued Atlantic Richfield Company ("Arco") for unpaid royalty interests. The trial court granted summary judgment in favor of Arco based on the statute of limitations. In three points of error, HEI claims the trial court erred in granting summary judgment because the discovery rule applies and genuine issues of material fact exist as to whether Arco fraudulently concealed HEI's causes of action.

HEI or their predecessors in interest entered into oil, gas, and mineral leases between 1949 and 1956. In 1957, the properties subject to those leases were unitized to form the Headlee Devonian Unit (HDU), which utilized a gas processing plant (the Plant). Arco, Texaco, and other entities

* The Honorable Jackson B. Smith, Justice, Re-    tired, sitting by assignment.

were working interest owners in the HDU and also owned the Plant. Texaco was the Plant operator.

Each working interest owner paid royalties to the royalty interest owners separately, pursuant to separate leases and division orders, and the amount of royalties fluctuated on a monthly basis. In 1977, Texaco decided to reduce the percentage of royalties it paid on the processed natural gas liquids (NGLs) from 100% to 85% in order to defray the costs of building a new plant. They withheld severance taxes, however, based on 100% of the value of the NGLs. To make the reduction less noticeable, Texaco allegedly convinced the other working interest owners, including Arco, to follow suit, and no working interest owner informed any royalty interest owner of the change.[1] The reduction in the amount of royalties paid to the royalty owners between the years 1977 and 1986 is the basis for this lawsuit against Arco. The crux of HEI's appeal is that the statute of limitations had not run on its claim.

In October of 1986, Arco sold its interests in the HDU and the Plant to Amoco. Later, appellant Houston Endowment's bookkeeper, Alan Thigpen, noticed discrepancies in Texaco's calculation of severance taxes. Thigpen made written inquiries to Texaco to clarify the matter, but he apparently did not receive satisfactory responses. Thigpen eventually determined, no later than May 10, 1989, that Texaco was withholding 15% of the royalties on the sale of the NGLs processed through the Plant. Thigpen obtained a tolling agreement with Texaco, effective April, 1990, but did not seek one from any other working interest owner.

Concurrent with Thigpen's investigation, C.R. Bailey, a representative of several appellants collectively known as "The Parks Group," was investigating NGL price discrepancies for the HDU, and Texaco informed him in 1987 that the 15% withholding was for the Plant's operating costs.

HEI sued Texaco, Four Star, Chevron, Mobil, and Amoco in 1990, seeking accountings from the last four entities because they had refused to provide sufficient information to verify the royalty payments. Arco was not a party to that suit.[2] In January of 1993, during the course of discovery, HEI claims they first learned of the working interest owners' agreement to withhold royalties, and documents indicated Arco was a party to the alleged scheme. They assert that this was their first knowledge that Arco was involved. HEI eventually obtained a tolling agreement with Arco, effective September 22, 1993. They filed suit against Arco on March 2, 1995, and thereafter, Arco filed a motion for summary judgment based on the statute of limitations. HEI responded that the discovery rule applied to toll the running of the statute of limitations. The trial court granted Arco's motion, although its order does not specify whether or not it applied the discovery rule.

In their first and second points of error, HEI contends the trial court erred in granting Arco's motion for summary judgment based on limitations because (1) the discovery rule applied, and (2) genuine issues existed as to when appellants discovered or should have discovered the causes of action against Arco.

### Standard of Review

We review the trial court's order granting summary judgment, indulging every reasonable inference in favor of the nonmovant. *See Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). When a defendant moves for summary judgment on the basis of an affirmative defense, such as limitations, it must prove conclusively all elements of the affirmative defense as a matter of law and preclude all genuine issues of material fact. *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996).

1. In their brief, HEI alleges that these actions amounted to a conspiracy; however, they did not make this allegation in their petition or motions to the court. As such, we need not address this argument. *See* Tex R. Civ. P. 166a(c).

2. HEI asserted the same allegations against Arco in this suit as it did against the defendants in the 1990 suit.

### The Applicable Statute of Limitations

■ The parties agree the statute of limitations in breach of contract cases, including cases involving oil and gas royalties, is four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 1986); *Williams v. Khalaf,* 802 S.W.2d 651, 653 (Tex.1990). A statute of limitations does not begin to run until the cause of action accrues. *See Moreno v. Sterling Drug,* 787 S.W.2d 348, 351 (Tex.1990). Generally, a cause of action for breach of contract accrues on the date of the alleged breach. *See Harrison v. Bass Enters. Prod. Co.,* 888 S.W.2d 532, 537 (Tex. App.—Corpus Christi 1994, no writ). An exception arises, however, if the discovery rule applies. The discovery rule is a judicially-constructed test used to determine when a plaintiff's cause of action accrued. When applied, it tolls the running of the statute of limitations until the plaintiff discovers or should have discovered the nature of the injury. *See Murphy v. Campbell,* 964 S.W.2d 265, 271 (Tex.1997). When a defendant seeks summary judgment on the basis of limitations and the plaintiff pleads the discovery rule, the defendant has the burden to prove when the cause of action accrued and negate the discovery rule by proving as a matter of law that there is no genuine issue of fact regarding when the plaintiff discovered or should have discovered the nature of the injury. *See Burns v. Thomas,* 786 S.W.2d 266, 267 (Tex.1990); *Ponder v. Brice & Mankoff,* 889 S.W.2d 637, 641 (Tex.App.—Houston [14 th Dist.] 1994, writ denied).

■ HEI argues the discovery rule should apply so that their causes of action did not accrue until they knew or should have known of the underpaid royalties. A court must conduct a two-step process to determine whether and for how long the rule tolls the statute of limitations. First, it must determine if (1) the injury is inherently undiscoverable, and (2) the evidence of the injury is objectively verifiable. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex.1996). Arco does not dispute that HEI's alleged injury is objectively unverifiable, but it asserts the injury was discoverable. If the party asserting the discovery rule establishes these elements, a court, in order to determine when the statute of limitations began to run, must still determine whether the injured party knew or should have known of the injury. *See id.* at 455.

■ An injury is inherently undiscoverable if a party using due diligence would not ordinarily learn of the negligent act or omission. *See Id.* HEI argues their case is similar to *Dorchester Gas Producing Co. v. Hagy,* 748 S.W.2d 474 (Tex.App.—Amarillo 1988, dism'd by agr.) which applied the discovery rule to an oil and gas breach of contract case after determining the plaintiff's injury was inherently undiscoverable. In *Dorchester,* the plaintiff sued for underpayment of royalties he should have received pursuant to a contract requiring a royalty increase when a federal order increased the minimum wellhead price. *See id.* at 476–77. A federal order subsequently raised the price, but the royalties did not increase. *Id.* at 475, 477. The defendants asserted the statute of limitations barred plaintiff's claims to any underpayments occurring more than four years earlier. *Id.* at 479. The court held the discovery rule applied, as the relationship between the plaintiff and defendants was such that the plaintiff could not learn of any price increase except through one of the parties to the increase. *Id.* at 480.

HEI, like the plaintiff in *Dorchester,* did not receive detailed accounting showing the basis for the calculation of royalties, and the amount of royalties could not be calculated from the information Arco supplied in its monthly statements. HEI points to other evidence making the determination of underpayments inherently undiscoverable, such as a Texaco memorandum stating the royalty owners were probably not notified of the change in the royalty calculation. HEI alleges the working interest owners' scheme was to underpay royalties and avoid detection by all agreeing to lower the payments, thus making the underpayments less noticeable. HEI also alleges that the fact that the working interest owners did not exchange documents is further evidence of their conspiracy.

Arco answers by first arguing the discovery rule only applies to cases in which it has been expressly adopted by the Texas Supreme Court. *See Harrison,* 888 S.W.2d at

538. It contends the rule is not germane to the present case because the Texas Supreme Court has never explicitly adopted it in a royalty owner dispute. *Id. Harrison* relied on *Trinity River Authority v. URS Consultants, Inc.*, 889 S.W.2d 259, 263 (Tex.1994), to support its statement that "the Supreme Court of Texas must explicitly adopt the discovery rule before it is applicable to a cause of action." *Harrison*, 888 S.W.2d at 538. We believe the *Harrison* court read *Trinity River* too broadly. In *Trinity River*, the court refused to apply a statute of repose to a negligent design case because the discovery rule had not been adopted for such a case when the statute of repose was enacted. *See Trinity River*, 889 S.W.2d at 263. The supreme court did not state, in that case or any other, that it must adopt the discovery rule before it is applicable to a cause of action. Furthermore, Arco's argument, if carried to its logical conclusion, would require a party to raise the discovery rule issue to the trial court, knowing it could not succeed on the merits but could, at best, hope to appeal the issue to the supreme court, where it would have its first opportunity to successfully argue that the rule applies. The likelihood a party would do this is minimized further by the possibility of sanctions under Rule 13. *See* TEX.R. CIV. P. 13.

Arco argues in the alternative that even if the rule could apply without supreme court authorization, HEI's injury was not inherently undiscoverable. It contends the rule has limited application and is generally employed in tort cases. Further, the rule should not be applied in a royalty dispute case, as the production volumes and severance taxes are a matter of public record, thus making the amount owed discoverable and calculable. It also contends this particular case should not be subject to the discovery rule, as the evidence establishes HEI's actual knowledge of the injury.

Arco relies on *Neel v. HECI Exploration Co.*, 942 S.W.2d 212 (Tex.App.—Austin 1997, writ granted). The plaintiff in *Neel* leased his land for exploration and oil production but reserved a royalty interest. *See id.* at 215. The defendant was producing oil on the land when it discovered another company was producing excessively on a neighboring parcel. The defendant filed a successful lawsuit against the company, and the *Neel* case involved the plaintiff's attempt to recover a portion of the judgment the defendant obtained. *Id.* The court found the discovery rule applied, as the injury was inherently undiscoverable because a lessor using due diligence would not suspect undisclosed, binding legal action by the lessee. *Id.* at 221. However, the court explained that its holding "in no way affects the royalty owners' proper burden to ensure that their working interest holder is adequately compensating them for production." *Id.* at 221 n. 4; *see also Enterprise–Laredo Assocs. v. Hachar's, Inc.*, 839 S.W.2d 822, 838 (Tex.App.—San Antonio), *writ denied with per curiam opinion*, 843 S.W.2d 476 (Tex.1992). Arco cites the footnote in *Neel* as authority for the proposition that the discovery rule should not apply to a suit for breach of contract for underpayment of royalties based solely on production.

*Dorchester* and *Neel* are distinguishable from this case. *Dorchester* involved payments stemming from collections from a third party. There is no third party involved in the present case; rather, the working interest owners unilaterally changed the calculation. The facts in *Neel* are even less similar because that case involved non-payment of a royalty resulting from a judgment obtained against a third party.

■ Arco's underpayment of royalties was not information about which the royalty owners, using due diligence, would ordinarily learn; they would not learn about this information unless it was supplied by a working interest owner. Thus, the injury was inherently undiscoverable. As such, the discovery rule tolls the statute of limitation until the appellants subjectively knew or should have known of the underpayment. *See Computer Assoc.*, 918 S.W.2d at 455. Whether a plaintiff knew or should have known of an injury is generally a question of fact for the jury unless the defendant establishes that there is no genuine issue of material fact establishing that the plaintiff knew or should have known of the injury. *See City of Houston v. Garrett*, 816 S.W.2d 800, 802 (Tex.App.—Houston [14th Dist.] 1994, writ denied). HEI

argues it only knew of Texaco's underpayment prior to 1989, which does not implicate its knowledge of the other working interest owners' underpayments. Arco's summary judgment proof shows otherwise.

Arco's summary judgment proof included:

(1) HEI's original petition in 1990 against Texaco, Four Star, Mobil, Chevron, and Amoco, alleging "defendants" wrongfully and unreasonably withheld a portion of royalties and improperly assessed taxes.

(2) Texaco suit deposition testimony of appellant Charlotte Kimberlin, who stated her attorney advised her in 1987 that she (as a royalty interest owner) was being charged an inappropriate fee for the Plant;

(3) Texaco suit deposition testimony from the same appellant that what caused her to file suit *in the Texaco case* was information from Parks Group representative Bailey in 1987 that Texaco *and the others* were retaining 15% for plant processing charges, that there were discrepancies in the amounts she was being paid *by the different companies,* and that severance taxes were being incorrectly calculated;

(4) Texaco suit deposition testimony from the same appellant that she has claims against Arco if they are part of the HDU;

(5) a letter from Bailey to Arco dated May 12, 1987, noting he had come across discrepancies in the volumes used for payment and the volume sold of production from the HDU;

(6) a letter from Bailey to Kimberlin, dated June 1, 1987, discussing the discrepancies noted in (5), advising that letters were written to the working interest owners, and informing her of the plant operating cost Texaco was deducting;

(7) the deposition testimony of Houston Endowment's bookkeeper Thigpen stating that as early as 1982, he questioned Texaco's calculation of severance and windfall profit taxes;

(8) a letter from Thigpen to Amoco dated August 13, 1987, less than a year after Arco sold its interest to Amoco, stating that "for years" he felt he should verify the amount of severance taxes charged;

(9) the affidavit of Thigpen in the Texaco lawsuit stating he had actual knowledge of Texaco's 15% retention prior to January 1989;

(10) a letter from Amoco to Thigpen dated August 7, 1987, noting Arco furnished no monthly work papers regarding the HDU to Amoco and explaining that Thigpen needed to direct any questions regarding prior period adjustments made by Arco to Arco;

(11) a letter from Thigpen to Amoco dated December 23, 1987, again stating he has wanted to verify the severance taxes "for several years" and requesting documentation for severance taxes charged during the first ten months of 1987 and the highest posted price of crude oil for each month beginning January 1, 1980;

(12) a letter from Amoco to Thigpen dated March 3, 1988, again directing Thigpen to Arco for answers to inquiries concerning circumstances prior to Arco's sale to Amoco;

(13) letters from Bailey to Superior Oil, Rutherford Oil, Meridian Oil, and National Cooperative Refinery Association, dated May 1987, noting the volumes for gas sales are not listed on the royalty checks, requesting detail for the checks, and asking them to list volumes on all future checks. Bailey also wrote letters in May 1987 to Mobil and Chevron requesting documentation to support royalty calculations; and

(14) a letter from Bailey to Arco, dated May 12, 1987, noting discrepancies in the volume used for payment and the volume sold at the plant. In this letter, Bailey also points to non-HDU leases for which check stubs do not have a total gas sales volume.

The above proof shows that in 1982, Houston Endowment had questions concerning gross sales price reduction and sales tax rates. In 1987 and again in 1988, Amoco, in response to Houston Endowment's questions

**162**

concerning production and taxes during Arco's ownership, advised Houston Endowment to direct such questions to Arco. In addition, there is deposition testimony that Bailey, representing The Parks Group, and Charlotte Kimberlin, one of the individual appellants, had actual knowledge in 1987 of the 15% retainage for plant processing charges for Texaco and the other companies.

In their responses to Arco's motion for summary judgment, HEI offered the following proof:

(1) deposition testimony of appellant Henry Taub, stating that, prior to the institution of the lawsuit against Texaco, he was not concerned about the severance taxes, non-payment for certain gas, or the price of the product;

(2) deposition of appellant Joanna Taub Ross, stating that she did not understand the run statement and never hired anyone to analyze one;

(3) deposition of appellant Mary Wright, stating that she didn't understand the check statement, didn't know how to check the figures, made no attempt to analyze the statement figures, and did not take her statement to an accountant to verify her payment;

(4) deposition of appellant H. Hill Glover, stating that he did not receive production numbers, believed Bailey would investigate the division orders, lease agreements, and similar items but that Bailey couldn't get enough information to come to a conclusion, that HEI took over the investigation in 1990 or later, and that he relied on Texaco, Chevron, and Amoco to be truthful and provide accurate information;

(5) deposition of appellant Allen McGuire, stating that he had no information to calculate royalties he received from Texaco, he had no personal knowledge causing him concern about Texaco's royalties, and that he could not determine whether misrepresentations were made based on the information in the run statements;

(6) deposition of Al E. McClellan, stating that he did field work for an audit on the royalties paid to HEI but reached no final conclusions on how the royalties were paid, and the check stubs did not give information regarding the amount on which severance taxes were charged;

(7) deposition of Charles Gee, a retired division vice-president for Texaco's natural gas division, stating he had no knowledge of whether anyone notified the royalty interest owners of the plan to initiate a plant split;

(8) deposition of Randall Bailey, stating he could not determine from the check stub that 15% was being deducted, he asked Amoco for division orders to determine applicable acreage but received no documents, he did no investigation to determine whether Amoco paid the proper amount to appellant the Kimberlin/Parks estate, and that he had no opinion regarding whether Amoco was paying the proper amount;

(9) the affidavit of H.J. Nelson, II, Houston Endowment president, refuting Houston Endowment's actual knowledge of the 15% withholding until the investigation in the Texaco suit and that Arco gave no indication it was paying royalties on less than 100% of the NGLs; and

(10) affidavits of Taub, Don Debenport, R.E. Hibbert, Wright, Ross, McGuire, Kimberlin, and Glover, stating that they did not know or suspect Arco withheld 15% until during the investigation in the Texaco suit.

■ It is not necessary to discuss in detail the numerous letters from the various appellants to Texaco and the other companies, including Arco. Suffice it to say that HEI's questions to the working interest owners concerning variances in production, sales, and taxes at various times make it clear that they knew or should have known of the 15% reduction in royalty payments by Arco prior to September 23, 1989, which date was four years prior to the effective date of the tolling agreement with Arco. HEI's evidence, at best, establishes that HEI did not have actual knowledge of the withholding; however, it does not raise a genuine issue of material

fact regarding their constructive knowledge. As such, Arco was entitled to summary judgment based on the statute of limitations.

Points of error one and two are overruled.

## Arco's Alleged Fraudulent Concealment

In its third point of error, HEI contends the trial court erred in granting the motion for summary judgment because genuine issues of fact exist as to whether Arco fraudulently concealed HEI's cause of action. HEI contends Arco owed it a duty of candor. *See NRC, Inc. v. Huddleston,* 886 S.W.2d 526, 530 (Tex.App.—Austin 1994, no writ). This argument stems from their contention that Arco engaged in conduct to conceal the true facts and affirmatively disclosed certain information on which it knew HEI would rely. HEI asserts Arco failed to disclose the underpayments, presented tax severance information that implied royalties were based on 100 percent of production, and concealed its actions. HEI's reliance on *Huddleston,* however, is misplaced. The duty of candor required in that case arose in a fiduciary relationship, which relationship is not present in this case. HEI cites no authority for the proposition that a party to a contract owes the other party a duty of candor.

██ If a party's misconduct keeps another party from learning of an injury, the statute of limitations will not run. *See Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997); *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996). The estoppel ends, however, when the injured party learns or should have learned of facts, conditions, or circumstances which would cause a reasonable person to inquire further, when such inquiry would lead to the discovery of the concealed wrong. *See Velsicol,* 956 S.W.2d at 531. On summary judgment, the non-movant has the burden to come forward with proof raising an issue of fact on fraudulent concealment. *See Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996). To defeat summary judgment based on fraudulent concealment, the non-movant must establish (1) an underlying tort; (2) the movant's knowledge of the tort; (3) the movant's use of deception to conceal the tort; and (4) the non-movant's reasonable reliance on the tort. *See DiGrazia v. Old,*

900 S.W.2d 499, 502 (Tex.App.—Texarkana 1995, no writ).

██ As noted in the discussion of points of error one and two, there is no genuine issue of material fact regarding HEI's constructive knowledge of the underpayments. All the proof establishes they should have looked further, beyond Texaco, Chevron, Mobil, and Amoco, to whom Arco had sold its interest before HEI filed suit, and in fact, some proof indicates they did look to Arco as well. At a minimum, if HEI looked further, they would have discovered the same facts, conditions, and circumstances regarding Arco's alleged misconduct that led HEI to sue the other working interest owners in its 1990 lawsuit. Although we held that the discovery rule applies, because appellants knew or should have known of the underpayments, HEI's claim of fraud is time-barred.

Point of error three is overruled.

██ HEI filed one brief on behalf of all appellants. All points of error were briefed as if there was only one appellant, to wit, Houston Endowment. References in the brief are made to "Houston Endowment," "Parks Group," and "remaining Appellants," but no distinction is made between them in the points of error, briefs, or oral argument to this court. Our opinion, therefore, in accordance with HEI's brief, treats all appellants as one appellant. Issues not separately briefed or presented to this court by an appellant are waived. *See Federal Sign v. Texas Southern Univ.,* 951 S.W.2d 401, 407 (Tex.1997).

The judgment of the trial court is affirmed.