**NRC, INC. d/b/a National Realty, Appellant,**

v.

**Richard HUDDLESTON, Appellee.**

No. 3–92–580–CV.

Court of Appeals of Texas, Austin.

Oct. 26, 1994.

Rehearing Overruled Dec. 7, 1994.

Barry Bishop, Susan P. Burton, Clark Thomas Winters & Newton, Austin, for appellant.

Mark Cohen, Austin, for appellee.

Before POWERS, JONES and KIDD, JJ.

KIDD, Justice.

Appellee, Richard Huddleston, sued his escrow real estate agent, NRC, Inc. d/b/a National Realty ("NRC"), for deceptive trade practices ("DTPA"), breach of warranty, and breach of fiduciary duty in conjunction with a real estate transaction. A jury returned a verdict for Huddleston for actual and punitive damages. The trial court rendered judgment for actual and punitive damages based on NRC's breach of fiduciary duty, but denied actual damages and attorney's fees for NRC's DTPA and warranty violations. NRC appeals from the trial court's final judgment. Huddleston cross-assigns error for the trial court's failure to award additional actual damages and attorney's fees.

## THE CONTROVERSY

Huddleston was a contractor who built homes for speculative resale in the Lago Vista area. He completed and sold five or six such houses; the house made the basis of this lawsuit was the last. He listed this house for sale at approximately $160,000.

In early 1986, Bernie and Kathy McGinley expressed interest in the house in question, but it was outside their price range. NRC, as the real estate agent, proposed a lease-purchase arrangement which Huddleston rejected. Finally, in February 1986, NRC presented Huddleston with a real estate contract signed by the McGinleys for $130,000. After some negotiations, Huddleston signed the contract on February 8, 1986. The McGinleys submitted a $2,000 check to NRC as earnest money—more will be said later about the $2,000 check—and the contract called for a closing date of March 7, 1986. The McGinleys could not obtain financing and were unable to close on March 7, whereupon Huddleston gave the McGinleys an oral four-week extension to obtain financing. After the extension had expired and the McGinleys still had not obtained financing, Huddleston began negotiations with E.E. and Lillian Dallmann for the purchase of the property. The Dallmann contract was negotiated without a real estate agent; thus, NRC was not entitled to a commission on the Dallmann contract. Additionally, the Dallmann contract was for considerably more money, $153,000, than the McGinley contract of $130,000.

Apparently, NRC and its agent-employee Carol Schneider learned about the Dallmann contract and realized that NRC was going to lose a real estate commission. Carol Schneider, in the presence of witnesses, threatened Huddleston that if he went through with the Dallmann sale, she would see to it that Huddleston would never sell another piece of property in Lago Vista. Furthermore, to carry out her threat, Schneider contacted the McGinleys and encouraged them to file a suit for specific per-

formance against Huddleston to force him to sell the house at the $130,000 contract amount. On April 24, 1986, the McGinleys filed suit against Huddleston for specific performance and in addition filed a *lis pendens* on the property effectively blocking the sale of the property to the Dallmanns. Huddleston then filed a cross-action against the McGinleys and joined NRC as a cross-defendant.

In discovery before trial, Huddleston learned that NRC had never deposited the $2,000 escrow check from the McGinleys. The check had been drawn on a closed bank account and was thus *"insufficient."* There was considerable debate as to *exactly when* NRC knew the check was bad. Huddleston presented a letter from NRC indicating that it knew the check was bad at the time of the execution of the contract in February 1986. NRC called the author of the letter at trial to explain that he did not know the check was bad until May 1986.[1] In any event, it was undisputed in the trial testimony that NRC violated well-established rules set by the Real Estate Commission in *not* depositing the escrow check and more importantly, in *not* informing its principal, Huddleston, that the escrow check was "insufficient." Huddleston contended that the latter breach by NRC was even more important because the McGinleys were apparently experiencing difficulty in financing the purchase of the house.

In the fall of 1986, the McGinleys, on the advice of counsel, decided to abandon their specific performance lawsuit. At that point, the McGinleys offered to dismiss their case *with prejudice* if Huddleston would drop his cross-action. Huddleston declined. As a result, the McGinleys dismissed their case but *without prejudice to refile.* The importance here is that trial testimony revealed that, even at this point, the Dallmanns were still willing to carry through on the contract. However, Huddleston presented two attorneys as real estate experts who testified that the McGinleys' dismissal *without prejudice* continued to cloud the title to the property and that Huddleston was duty-bound to inform the Dallmanns, as he did, about this potential problem. NRC presented counter-

experts who testified that a title policy could have been written on the property and that the Dallmann sale could have been consummated, but even NRC's experts had to admit that the title policy would probably have contained an exception not covering the possibility of the refiling of the McGinley lawsuit. Ultimately, Huddleston lost the sale to the Dallmanns and eventually lost the subject property to his lender through foreclosure.

### The Jury Verdict

After hearing all of the evidence and judging the credibility of the witnesses, the jury failed to find the McGinleys engaged in any wrongful conduct. However, the jury found liability on the part of NRC, and awarded Huddleston actual and punitive damages. Specifically, the jury findings are outlined as follows:

A. Liability

1. DTPA Violations

(a) Misrepresentation

Question 1—NRC engaged in false, misleading or deceptive acts or practices.

(b) Breach of Warranty

Question 3—NRC failed to perform services in "a good and workmanlike manner."

Question 4—NRC breached an express warranty.

2. Breach of Fiduciary Duty

Question 8—NRC breached fiduciary duties it owed to Huddleston.

B. Actual Damages

Question 5—Actual Damages for DTPA violations: $13,958.

Question 9—Actual damages for breaching its fiduciary duty: $23,042.

C. Exemplary Damages

Question 10—Awarded $50,000 for NRC's breach of its fiduciary duty to Huddleston.

### The Trial Court's Judgment

NRC moved for judgment notwithstanding the verdict, while Huddleston moved for

---

1. This dispute in the evidence was, of course, for the jury to resolve.

judgment on the verdict. The trial court rendered judgment for Huddleston against NRC for actual damages of $23,042, and exemplary damages of $50,000 for its breach of fiduciary duty. The trial court *disregarded* the jury's DTPA findings and, as a result, did not award the actual damages of $13,958 for the DTPA violations and refused to award $41,917.50 in attorney's fees proved by Huddleston as reasonable and necessary.

NRC appeals, bringing forth four points of error. NRC challenges the jury's liability findings in points of error one and two and the damages award in points of error three and four. By a cross-point of error, Huddleston contends that the trial court erred in refusing to award damages for the DTPA and warranty violations NRC committed.

## DISCUSSION

### *The Jury's Liability Findings*

■ In its first point of error, NRC contends that the evidence is legally and factually insufficient to support the jury's findings on causal connection, *i.e.*, that NRC's DTPA and warranty violations were a *producing cause* of Huddleston's damage. We note at the outset that NRC does not challenge that portion of the jury's liability finding regarding wrongful conduct, but only whether such conduct was a cause in fact of Huddleston's damages. Indeed, NRC candidly admits that it engaged in at least one wrongful act in failing to deposit the McGinleys' escrow deposit check at the time of the initial real estate contract between Huddleston and the McGinleys. Such conduct is admittedly a violation of the rules and regulations of the Real Estate Commission and subjected NRC to a fine and reprimand by that body.

■ In deciding a no-evidence point, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 593 (Tex. 1986), *cert. denied*, 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In deciding a factual-sufficiency point, we must consider and weigh all the evidence, and may set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex.1951); *see also Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 Tex.L.Rev. 515 (1991).

The gist of NRC's argument is that Huddleston's case is premised on the failure of the Dallmann contract. NRC argues that since the Dallmanns were still ready to perform under the contract even after the McGinleys dismissed their lawsuit against Huddleston and released their *lis pendens* on the subject property, no action of NRC could have been responsible for the ultimate failure of the sale to the Dallmanns. We reject this argument.

The burden at trial was on Huddleston to prove producing cause, which the court's charge defined as follows:

> "Producing cause" is an efficient, exciting or contributing cause, which in natural sequence produces the injuries or damages complained of, if any. There can be more than one producing cause.

It is incumbent on Huddleston only to prove that NRC's conduct was *a* producing cause, as opposed to the *sole* cause. *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Uncontroverted testimony from Huddleston established that had he known that the McGinley escrow check was drawn on insufficient funds, he would never have extended the original real estate closing and the McGinley contract would have expired long before the origination of the Dallmann contract. Further, had the insufficiency of the escrow check's funds been known at the time of the McGinley contract's expiration, the McGinleys' breach would have undermined any possible lawsuit by the McGinleys against Huddleston for specific performance. Thus, Huddleston maintains that, with the elimination of the McGinleys' lawsuit and their *lis pendens* filing, the sale to the Dallmanns easily would have been consummated.

NRC also overstates its argument that the Dallmanns were willing to perform even after the McGinley lawsuit was dismissed. Mr. Dallmann stated that *absent any title problems* his wife still wanted to buy the property. There was considerable controversy at trial about this issue. Huddleston felt it was his duty to inform the Dallmanns about the McGinley lawsuit and the *lis pendens*. Although the McGinleys ultimately dismissed the lawsuit, they refused to dismiss the cause with prejudice. Thus, at the time that the Dallmanns were considering purchasing the property, Huddleston felt compelled to divulge to the Dallmanns that the McGinleys could refile their lawsuit during the four-year statute of limitations period. There was considerable expert testimony on both sides about the reasonableness of Huddleston's actions and the state of the title to the subject property at this point. Huddleston's attorney/real estate experts insisted that Huddleston's conduct, under these circumstances, was reasonable and that the Dallmanns were faced with the *possibility* of further litigation on the property. NRC's experts had to admit that litigation was always a possibility, but insisted the possibility was remote. Based upon this evidence, the jury resolved the issue in Huddleston's favor. While we agree that the evidence conflicts, we conclude that there is ample evidence to support the jury's conclusions that NRC's wrongful conduct was *a* producing cause of Huddleston's damages. NRC's first point of error is overruled.

■ In its second point of error, NRC contends that the evidence is legally and factually insufficient to establish that NRC's breach of its fiduciary duty to Huddleston was a *proximate cause* of damages to Huddleston. NRC argues that the McGinleys' lawsuit and *lis pendens* filing were absolutely privileged and therefore NRC's conduct in

encouraging the McGinleys to file suit was also privileged. We disagree.

This Court has observed that a fiduciary owes to its principal a strict duty of "good faith and candor," as well as *"full disclosure* respecting matters affecting the principal's interests," and that there is a "general prohibition against the fiduciary's using the relationship to benefit his personal interest." *Chien v. Chen,* 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ).[2] A case very factually similar to the instant cause is *Capital Title Co., Inc. v. Donaldson,* 739 S.W.2d 384 (Tex.App.—Houston [1st Dist.] 1987, no writ). In *Donaldson,* Capital Title, as escrow agent for the seller, Donaldson, misrepresented the date of the receipt of the escrow check from buyer one. As a result, Donaldson lost his sale to buyer two and consequently brought suit against Capital Title. The Houston First Court of Appeals upheld the jury's findings against Capital Title for fraud, misrepresentation, and breach of fiduciary duty. On the latter cause of action, the court specifically held that Capital Title had breached its fiduciary duty to Donaldson by engaging in conduct that benefitted itself, to the detriment of its principal Donaldson, and deprived him of a more profitable sale. *Id.* at 390.

Here, NRC's course of conduct by its employee, Carol Schneider, was designed to accomplish the same result. NRC realized that without the sale to the McGinleys, it would be deprived of a real estate commission. Therefore, Schneider's actions were directed toward forcing Huddleston to carry through on the McGinley contract, with the end result being the loss to Huddleston of the Dallmann contract, which was more profitable. We hold that the jury could decide that this conduct was a direct and proximate cause of damage to Huddleston, and overrule NRC's second point of error.

2. The trial court instructed the jury on fiduciary duty:

You are instructed in connection with your answer to Jury Question No. 8 [breach of fiduciary duty] that real estate agencies are fiduciaries toward sellers of real estate. And, that NRC, Inc., as a fiduciary, was required to exercise fidelity and good faith toward its principal; a fiduciary cannot put itself in a position

antagonistic to its principal's interest. A fiduciary has a positive duty to communicate all information which he has available to him or should have available to him which might be useful to its principal in making a business decision. The fiduciary duties which a real estate agent must provide include reasonable care, loyalty, and accounting.

## The Jury's Damage Findings

■ In its third point of error, NRC contends that there is insufficient evidence in the record to allow the jury to calculate the lost profits from the Dallmann sale and, thus, the jury's damage award is not supported by sufficient evidence.

The jury awarded Huddleston $37,000 in actual damages at trial. The two questions submitted in the court's charge were Questions 5 and 9. In response to Question 5, the jury awarded $13,958 for NRC's DTPA violations.[3] In response to Question 9, the jury found $23,042 in damages for NRC's breach of fiduciary duty.[4]

The evidence at trial established the following. Huddleston contended that he had lost $37,000 because of NRC's actions in blocking the sale to the Dallmanns by encouraging the McGinleys to sue for specific performance and file a *lis pendens* on the property. Huddleston calculated his damages, as evidenced by plaintiff's Exhibit 8, in the following manner:

$ 153,000 Sales Price
116,000 Note Payoff
37,000

In addition, Huddleston testified to certain other costs, which he called carrying costs, including items such as interest, utilities, maintenance, ad valorem taxes, and insurance. On this particular piece of property, the carrying costs were $1327 per month. Huddleston testified that one of the reasons he was willing to consider the McGinley contract at $130,000 was because that amount would pay off his bank loan of $116,000 and would stop accumulation of additional carrying costs.

NRC's basic attack was to establish on cross-examination that Huddleston had more *cost* tied up in the project than his $116,000 bank note. The defense brought out on cross-examination that Huddleston had paid $23,042 cash for the lot. Thus, it was NRC's position that only between $10,000 and $13,000 of the Dallmann sale at $153,000 would constitute *profit*. On redirect, Huddleston contended that at the Dallmann closing he would *pocket* $37,000 in cash free and clear of all his loan obligations, which he considered *profit* in light of the ultimate alternative, the subsequent foreclosure in which he lost the house *and* lot and received *no reimbursement*.

3. Question 5 submitted the damages for the DTPA violations as follows:

> What sum of money, if any, if paid now in cash would fairly and reasonably compensate Huddleston for his damages, if any, that resulted from the conduct of NRC, Inc. d/b/a National Realty you found that was committed in response to Jury Question Nos. 1, 2, 3, or 4? You are instructed in connection with your answer to Jury Question No. 5 that you may consider the following elements of damages and no others:
> a) Lost profit of the Dallmann sale;
> b) Out of pocket expenses incurred with respect to the property after the Dallmann contract should have closed.
> You are instructed that "lost profit of the Dallmann sale" means the difference between the amount Huddleston would have received under the Dallmann contract and the cost of the property to Richard Huddleston.
> You are further instructed to subtract from your answer any amount that you find Huddleston could have saved by the exercise of reasonable care. You may not subtract an amount that may have been avoided by Huddleston's agreement to settle his claims against the McGinleys.
> ANSWER in dollars and cents, if any.
> Answer: $ 13,958.

4. Question 9 submitted the damages for fiduciary duty violations as follows:

> What sum of money, if any, if paid now in cash would fairly and reasonably compensate Huddleston for his damages, if any, that resulted from the conduct of NRC, Inc. d/b/a National Realty you found that was committed in response to Jury Question No. 8? You are instructed in connection with your answer to Jury Question No. 9 that you may consider the following elements of damages and no others:
> a) Lost profit of the Dallmann sale;
> b) Out of pocket expenses incurred with respect to the property after the Dallmann contract should have closed.
> You are instructed that "lost profit of the Dallmann sale" means the difference between the amount Huddleston would have received under the Dallmann contract and the cost of the property to Richard Huddleston.
> You are further instructed to subtract from your answer any amount that you find Huddleston could have saved by the exercise of reasonable care. You may not subtract an amount that may have been avoided by Huddleston's agreement to settle his claims against the McGinleys.
> ANSWER in dollars and cents, if any.
> Answer: $ 23.042.

On appeal, NRC continues its same attack on the jury verdict as it used in the trial court, and additionally contends that the record lacks any evidence as to the original cost of constructing the house. Our review of the record reveals that the original bank note was for $106,000.[5] It is certainly inferable that the original note amount constitutes the original construction cost. We also believe that there is a certain ambiguity in the trial court's instruction on lost profit. The court's instruction defines lost profit as the "difference between the amount Huddleston would have received under the Dallmann contract and *the cost of the property to Richard Huddleston.*" The jury apparently agreed with Huddleston that $37,000 cash in his pocket was *profit to him.* However, even assuming the interpretation of the charge utilized by NRC is the correct one, we conclude that there is ample evidence to support the verdict and judgment.

From the testimony of Huddleston, the jury could properly conclude that the cost of the land, $23,042, and the original cost of construction, $106,000, gave Huddleston a total cost basis in the property of $129,042. Huddleston's contract with the Dallmanns for $153,000 minus $129,042, the cost to him for the property, even under NRC's analysis, yields a profit of $23,058. Since the actual damages awarded in the judgment totals $23,042, this profit yield is sufficient to support the judgment.

However, in view of our conclusion regarding Huddleston's cross-point, we will consider the total actual damages of $37,000. We conclude that the evidence is sufficient to support the entire verdict on actual damages of $37,000 because NRC has completely overlooked a second actual damage element in the court's charge: out-of-pocket expenses. Here, the testimony established that, as a result of NRC's conduct and the subsequent McGinley lawsuit, Huddleston was delayed in closing on the Dallmann contract for a number of months.[6] Huddleston was incurring carrying costs on the property at the rate of $1327 per month. As a direct result of NRC's wrongful conduct, a delay in closing on the Dallmann contract of a mere twenty-eight months would support the jury's actual damage award of $37,000.

Based upon this record, we conclude that there is sufficient evidence to support the jury's award of actual damages. NRC's third point of error is overruled.

In its fourth point of error, NRC argues that since there is insufficient evidence to support Huddleston's actual damages, the jury's punitive damage award must fail. In view of our holding that the evidence supports the jury's award of actual damages, we conclude that there is ample basis for upholding the punitive damage award as well. NRC's fourth point of error is overruled.

## HUDDLESTON'S CROSS–POINT

■ In his sole cross-point, Huddleston contends that the trial court erred in not awarding him actual damages for NRC's violations of the DTPA. Additionally, Huddleston argues that the trial court should have awarded him attorney's fees pursuant to the DTPA. NRC responds that the trial court rendered the correct judgment because Huddleston is not permitted to make a double recovery of actual damages that result from the same tortious conduct. NRC alleges that both the breach of fiduciary duty and the DTPA violations arose out of the same alleged wrongful conduct:

(1) NRC misrepresented that they had deposited the McGinley earnest money check;

(2) NRC failed to deposit the McGinley check within a reasonable time;

(3) NRC failed to disclose before the McGinley contract was signed or before the extension granted that the bank account was closed;

(4) NRC's employee encouraged the McGinleys to file a lawsuit against Huddleston; and

---

5. Apparently by trial the interest had increased the balance owed on the note to $116,000, which was Huddleston's starting point for his profit projection.

6. Although the length of the delay is not clearly revealed by the record, the Dallmann contract was dated April 17, 1986, and this cause was tried six years later, in June of 1992.

(5) NRC's employee threatened to keep Huddleston from buying or selling any property at Lago Vista.

Therefore, NRC contends that the trial court correctly required Huddleston to elect between the actual damages awarded under the DTPA and the damages awarded for the breach of fiduciary duty.

■ It is well-established law that a plaintiff may not recover twice under alternative causes of action. *Southern County Mut. Ins. Co. v. First Bank & Trust of Groves,* 750 S.W.2d 170, 173–74 (Tex.1988); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 367 (Tex.1987); *Stevenson v. Koutzarov,* 795 S.W.2d 313, 322 (Tex.App.—Houston [1st Dist.] 1990, writ denied). However, the remedies provided for in the DTPA are cumulative of other legal remedies:

> The provisions of this subchapter are not exclusive. *The remedies provided in this subchapter are in addition to any other procedures or remedies* provided for in any other law; provided, however, that no recovery shall be permitted under both this subchapter and another law of both actual damages and penalties for the *same act or practice.*

Tex.Bus. & Com.Code Ann. § 17.43 (West 1987) (emphasis added). The crucial issue for decision then is whether the jury's damage awards were for the *same act or practice.*

In conjunction with the jury's finding that NRC had violated the DTPA by engaging in false, misleading, or deceptive acts, the jury was specifically instructed by the trial court "that the filing of a specific performance lawsuit or filing of a *lis pendens* does not constitute a false, misleading, or deceptive act or practice." The jury's damages issue in Question 5 was conditioned on an affirmative response to the DTPA liability findings.

On the other hand, we have held that the evidence supports a breach of NRC's fiduciary duty to Huddleston by its conduct in *encouraging* the McGinleys to file a specific performance lawsuit and *lis pendens* against the property. The jury's response to Question 9 regarding damages is conditioned on an affirmative liability finding that NRC breached its fiduciary duty.

Therefore, we hold that the trial court erred in forcing Huddleston to elect between the two actual damage findings because the jury's verdict is premised on different conduct and therefore, does not constitute a double recovery. We sustain Huddleston's cross-point.

## CONCLUSION

We affirm that portion of the district court's judgment awarding actual and punitive damages for NRC's breach of its fiduciary duty to Huddleston. We reverse that portion of the district court's judgment denying Huddleston DTPA damages as found by the jury and render judgment awarding Huddleston damages of $13,958 for NRC's violation of the DTPA. Because the amount of attorney's fees under the DTPA is a question of fact,[7] we remand that portion of the cause to the trial court for determination of the award of attorney's fees.

POWERS, Justice, dissenting.

Because I would sustain NRC's points of error three and four, I respectfully dissent. Point of error three complains the evidence is legally and factually insufficient to support the actual damages found by the jury; point of error four complains that without actual damages, the punitive damages fixed by the jury cannot stand. It is necessary to discuss only point of error three.

## APPELLATE REVIEW OF JURY DAMAGE AWARDS

The basic legal precepts are familiar. We may sustain only those jury fact findings that are based on inferences fairly drawn from the evidence, which is to say those findings that are reasonable, that rest upon something more than speculation or surmise, and that do not require basing one inference upon another. *Briones v. Levine's Dep't Store, Inc.,* 446 S.W.2d 7, 10 (Tex.1969). In the case of damage findings, we may sustain

---

7. In this case the parties stipulated that the amount of attorney's fees would be submitted to

the trial court rather than the jury for determination.

the jury's findings only if the jury could have determined from the evidence, *with reasonable certainty*, the amount awarded. *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 187 (Tex.App.—Waco 1987, writ denied).

And most importantly, in our review of the sufficiency of the evidence to support any damages found by the jury, we must determine the issue *under the theory submitted to the jury.* We may not judge the sufficiency of the evidence under calculations different from those the jury were instructed to employ. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 447 (Tex.1993).

## THE THEORY OF DAMAGES SUBMITTED TO THE JURY

Before reviewing the evidence, I should note that the formulation of the damage issues, in questions five and nine, is quite specific concerning the elements the jury might consider and how damages must be calculated. The questions are quoted in the majority opinion. I need only summarize them.

The charge authorized the jury to consider only two "elements of damages and no others." The *first* element was Huddleston's "lost profit on the Dallman sale," calculated as "the difference between the amount [he] would have received under the Dallman contract and the cost of the property to Richard Huddleston." The *second* element was Huddleston's "out-of-pocket expenses" associated with the property "after the Dallman contract should have closed," less any amounts Huddleston might have saved by exercising reasonable care. These instructions were identical for both questions five and nine.

Under the foregoing instructions and from the identical body of evidence, the jury calculated that Huddleston required $13,958 to compensate him for injuries inflicted by NRC's deceptive trade practice (question five) and $23,042 to compensate him for injuries resulting from NRC's breach of contract (question nine). The two sums total, perhaps coincidentally, $37,000, a sum Huddleston testified was his total damages, albeit calculated under a formula of his own rather than

under the formula given in the jury instructions.

## SUMMARY OF THE EVIDENCE

Huddleston purchased the unimproved lot for $23,042 on April 13, 1984. On August 24, 1984, he and William E. Moore entered into a written agreement of joint venture to erect a house on the lot and to sell the improved property. They executed and evidently delivered to the Bank of the Hills their promissory note, dated June 18, 1985, in the original principal sum of $106,000. Huddleston testified the debt was incurred to finance construction of the house on the lot.

By deed dated January 31, 1986, Moore and Huddleston joined in conveying the property to Huddleston alone. The deed recites that Huddleston paid the following consideration: a nominal consideration of $10.00, his assumption of the bank debt of $106,000 (for which Huddleston was already liable), and "other consideration."

In a contract dated April 17, 1986, Dallman agreed to purchase the improved property from Huddleston for $153,000. Dallman paid Huddleston $15,000 of the purchase price as a down payment. Huddleston applied the $15,000 to reduce by that amount his then-current debt to the bank. The amount of the bank debt at the time was $116,000—an increase of $10,000 from the original debt of $106,000. Huddleston's $15,000 payment to the bank left the balance of the debt at $101,000.

Moore and Huddleston made a few interest payments to the bank; Huddleston made most of them. The testimony is obscure and inconsistent about whether and in what amounts payment was made for taxes, utility service, and insurance premiums before and after May 30, 1986, the scheduled closing date of the Dallman sale. (These are the "out-of-pocket" expenses referred to in the jury instructions.)

The body of the evidence is silent regarding the following matters: (1) whether the original bank-loan proceeds of $106,000 were actually expended to pay any construction costs; (2) whether the additional loan proceeds of $10,000 were for the purpose of

constructing the house and actually expended for that purpose; (3) whether the bank-loan proceeds were the *total* cost of constructing the house, with Moore, Huddleston, or anyone else paying nothing in that regard; (4) what was the actual consideration Huddleston and Moore paid for their conveyance of the property to Huddleston alone.

Huddleston testified his lost profit was $37,000, which he calculated in the following manner: anticipated proceeds of the Dallman contract ($153,000) less the balance of the bank loan on the date the Dallman contract should have closed ($116,000) equaling a lost profit of $37,000.

## THE MAJORITY'S THEORIES

The majority hold the evidence sufficient, on either of two theories, to support the jury's answers to questions five ($13,958), nine ($23,042), and both together ($37,000).

Under the majority's *first* theory, they sustain the $23,042 found by the jury in answer to question nine. It is reasonable, to conclude, they say, that Huddleston's original promissory note in the amount of $106,000 "constitutes the original [sic] construction cost" while the evidence shows that $23,042 was the cost of the lot to Huddleston. The majority then calculate as follows: $106,000 (construction cost) plus $23,042 (cost of the lot) equals $129,042; and $153,000 (Dallman contract amount) less $106,000 equals $23,058. Evidently, the majority then determine that $23,058 is sufficiently near the $23,042 found by the jury to support their finding, under the maxim that the law does not take account of such small amounts.

In terms of the sufficiency of the evidence, the majority's first theory is not supportable because it disregards certain transactions shown by the undisputed evidence, indeed by Huddleston's own testimonial admissions. These pertain to the calculation of Huddleston's "lost profit." The majority's theory assumes that Huddleston's bank loan of $106,000 was the exclusive source and the limit of his construction cost. However, Huddleston admitted that he received a $15,000 down payment *under the Dallman contract*. He testified that he applied this to his bank loan, reducing the balance of his debt to

$101,000 from *$116,000*. This $10,000 increase in the principal of his debt to the bank is also shown by other undisputed evidence. It is the identical debt from which the majority infer that Huddleston's construction costs were $106,000, but nothing in the evidence implies that the $10,000 was not *also* for construction costs. There is no reasonable basis, therefore, for the majority's arbitrarily limiting Huddleston's construction costs to $106,000. In addition, of course, the majority may not reasonably calculate Huddleston's lost profit on the basis of the Dallman contract price of $153,000 because that amount must be reduced by the $15,000 down payment that Huddleston received from the Dallmans and applied to reduce his bank debt. Hence the majority's calculations are not reasonable inferences from the evidence.

Under the majority's *second* theory, they sustain the sufficiency of the evidence to support the jury's answers to both question five ($13,958) and question nine ($23,042). This is their theory: The two sums found by the jury total $37,000. The evidence shows that Huddleston incurred $1,327 per month for "carrying costs" alone (referring to the $1,327 per month incurred for interim financing, ad valorem taxes, maintenance, insurance, and utilities). Six years elapsed between the date of the Dallman contract (April 17, 1986) and the date of trial (June 1992). If one multiplies the $1,327 by only twenty-eight months of the elapsed time, the result is $37,156, a sum sufficiently near the total of $37,000 found by the jury in answer to the two special questions.

In terms of the sufficiency of the evidence, the majority's theory is insupportable for a number of reasons. I shall mention only one. The evidence shows without dispute that the property was sold at a trustee's sale "sometime in" 1987, following the trustee's posting of notice on June 2, 1987. At most then, only about fifteen of the majority's assumed twenty-eight months passed while Huddleston owned the property; nothing in the evidence suggests that he continued to pay utilities, maintenance, insurance, and so forth even though he no longer owned the property after the trustee's sale. I might also add that the jury instructions required the calcu-

lation of damages from the date the Dallman contract should have closed, not from the date of the contract itself (April 17, 1986).

## THE MAJORITY'S THEORIES INCORPORATE AN IMPERMISSIBLE STANDARD OF REVIEW

In the foregoing paragraphs, I have *assumed* the validity of the theories the majority employ to sustain the jury's findings of damages. And I have tried to show how the evidence is insufficient, *even under those theories,* to support the jury's answers to questions five ($13,958) and nine ($23,042). Even under the majority's theories and calculations, the body of evidence simply does not permit a reasonable inference as to *any* amount of damages, with reasonably certainty, because nothing in the evidence purports to show or imply that any sum was the *total* amount Huddleston spent for construction costs; consequently, it is impossible to calculate his "lost profit" or his "out-of-pocket" expenses under the trial-court instructions. But the majority's use of their own theories and calculations constitutes a more serious error—an original error by *this* Court.

Under neither theory do the majority even purport to follow the theory and calculations the trial court instructed the jury to employ. Applying their first theory, for example, the majority omit to consider in their calculations the "out-of-pocket" expenses incurred by Huddleston after the date the Dallman contract should have closed, the second element of damages. Under their second theory, conversely, the majority omit to consider in their calculations the first element of damages— Huddleston's "lost profit." Instead, the majority calculate as they please and include or omit constitutive elements of the jury instructions as necessary to reach an artificial "construction cost," "lost profit," and "out-of-pocket" expenses approximating a sum found by the jury. If a construction cost—even an undisputed construction cost—is inconvenient because it will increase total construction costs, the majority have simply disregarded it in their calculations. Thus, they err "in failing to apply the appropriate review standard." *Sage St. Assocs.,* 863 S.W.2d at 447.

In *Sage Street,* for example, the jury were instructed to calculate damages based on the *costs* of the work performed plus overhead and profit. The court of appeals reviewed the sufficiency of the evidence under a theory that the plaintiff's damages equaled total contract price, less amounts already received, plus amounts spent on change orders and utilities, omitting from the computation expenses (costs) *avoided* by the contractor by not completing the job. In holding that the court of appeals erred in failing to apply the appropriate review standard, the supreme court explained:

> Whether the evidence was sufficient under the court of appeals' calculation does not establish whether the evidence was sufficient to support the damage award *under the theory submitted to the jury.*

*Id.* (emphasis added.)

Because the evidence does not permit the calculation of "lost profit" or the undefined "out-of-pocket expenses" incurred on the property, with reasonable certainty and without resort to speculation, and because these were vital elements of damages under the trial court's instructions, I would reverse the trial-court judgment and render judgment that Huddleston take nothing.