**Affirmed and Majority and Concurring Opinions filed September 15, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00061-CV

### B. MAHLER INTERESTS, L.P., Appellant

### V.

### DMAC CONSTRUCTION, INC., Appellee

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-64035**

## M A J O R I T Y   O P I N I O N

B. Mahler Interests, L.P. appeals the grant of summary judgment in favor of DMAC Construction, Inc. Mahler contends that the trial court erred in granting summary judgment because (1) the trial court granted DMAC's no-evidence motion for summary judgment when the motion failed to specifically challenge any elements of any cause of action Mahler asserted; (2) DMAC improperly asserted a ground for summary judgment for the first time in its reply; (3) DMAC failed to

conclusively negate the discovery rule; and (4) Mahler raised a genuine issue of material fact on each element of its fraudulent concealment argument. We affirm.

BACKGROUND

Mahler hired DMAC in 2005 to serve as general contractor for the construction of Briscoe Manor, an event center and reception hall. DMAC began construction in January 2006. The parties signed a Certification of Substantial Completion on October 25, 2006. Briscoe Manor opened for business in late 2006, but DMAC continued to complete "punch-list" items and change-order work throughout the remainder of 2006 and much of 2007.

Mahler hired Professional Engineering Inspections, Inc. in August 2007 to perform an inspection of the building and evaluate the property's condition after approximately one year of use. The extensive report (the "2007 report") identified a number of potential problem areas with the construction. Mahler passed the report along to DMAC and requested that DMAC perform certain additional repairs, but Mahler did not perform any additional independent inspection at that time.

All remaining work was completed and final payment was made by January 2008. Mahler began noticing other problems with the property beginning in late 2010. Mahler believed certain issues with the property resulted from defective construction, so it hired SMS Engineering in May 2012 to perform a second professional inspection of the property (the "2012 report"). The 2012 report identified three primary issues: (1) the porch roofs were not properly constructed; (2) interior-grade doors were installed at exterior locations; and (3) commercial-grade floors should have been used instead of the originally installed floors, which were rated for residential use only.

Mahler sued DMAC on October 26, 2012. In its original petition, Mahler alleged causes of action for breach of contract and breach of warranty based on the three issues identified in the 2012 report: (1) defective porch roof construction; (2) use of interior doors at exterior locations; and (3) installation of residential-grade floors in a commercial facility. Mahler also asserted that the discovery rule and the doctrines of equitable estoppel and fraudulent concealment operated to toll the accrual of Mahler's causes of action.

DMAC filed its "Amended Traditional and No-Evidence Motion for Summary Judgment" on July 18, 2014. DMAC argued that Mahler's claims were time-barred and that none of the tolling exceptions applied. The trial court held a hearing on August 8, 2014, at which time it orally denied the no-evidence portion of the motion. The trial court withheld its ruling on the remainder of the motion and granted Mahler time to provide additional briefing.

After Mahler submitted additional briefing and summary judgment evidence, the trial court signed an order granting DMAC's "Amended Traditional and No-Evidence Motion for Summary Judgment" on October 17, 2014. DMAC nonsuited a counterclaim for breach of contract on April 27, 2015. The trial court signed a clarifying order on May 5, 2015, stating that, as a result of the nonsuit, its October 17, 2014 grant of summary judgment was a final and appealable judgment. Mahler timely appealed.

## STANDARD OF REVIEW

We review summary judgments *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we examine the record in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).

3

A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Cantey Hanger, LLP*, 467 S.W.3d at 481. A trial court properly grants a traditional motion for summary judgment in favor of a defendant if the defendant conclusively establishes all elements of an affirmative defense or conclusively negates at least one element of each of the plaintiff's claims. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). A defendant seeking summary judgment on the affirmative defense of limitations must conclusively prove when the cause of action accrued and must negate the discovery rule by proving as a matter of law that there is no genuine issue of fact about when the plaintiff discovered or should have discovered the nature of the injury. *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).

A party moving for no-evidence summary judgment must show that there is no evidence of one or more essential elements of the claims or defenses on which the nonmovant would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). The motion must state the elements as to which there is no evidence. *Id.* We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## ANALYSIS

In its first issue, Mahler contends that the trial court erred by granting DMAC's no-evidence motion for summary judgment because the motion failed to

4

specifically challenge any elements of any cause of action Mahler asserted. In its second, third, and fourth issues, Mahler contends the trial court erred in granting DMAC's traditional motion for summary judgment because (1) DMAC improperly asserted a ground for summary judgment for the first time in its reply; (2) DMAC failed to conclusively negate the discovery rule; and (3) Mahler raised a genuine issue of material fact on each element of fraudulent concealment.

Because each of Mahler's underlying claims was premised on the three issues identified in the 2012 report — defective porch roof construction, use of interior doors at exterior locations, and installation of residential-grade floors in a commercial facility — we analyze Mahler's limitations issues in light of those three distinct alleged injuries.

We conclude that the trial court properly granted DMAC's traditional motion for summary judgment as to all of Mahler's claims. Therefore, we need not determine whether the trial court erred by granting DMAC's no-evidence motion for summary judgment.

## I.       Limitations

Mahler pleaded claims for breach of contract and breach of warranty. These claims are subject to a four-year statute of limitations. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 203 (Tex. 2011) (breach of contract); *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 668 (Tex. 1999) (breach of warranty).

Generally, a cause of action accrues when facts come into existence that authorize a claimant to seek a judicial remedy, when a wrongful act causes some legal injury, or whenever one person may sue another. *Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 430 (Tex. 2015). A breach of

contract claim accrues when the contract is breached. *Cosgrove v. Cade*, 468 S.W.3d 32, 39 (Tex. 2015). A breach of warranty claim accrues when the goods are delivered, "'regardless of the aggrieved party's lack of knowledge of the breach.'" *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 546 (Tex. 1986) (quoting Tex. Bus. & Com. Code Ann. § 2.725(b) (Vernon 1968)).

It is undisputed that the alleged breaches occurred at the latest by January 2008 when all construction was completed and final payment was made. Because Mahler's suit was not filed until October 2012 — more than four years after the alleged breaches — Mahler's claims are time-barred unless the statute of limitations was otherwise tolled.

## A. The Discovery Rule

Mahler contends it did not learn of the allegedly defective construction until it received the 2012 report. DMAC responds that (1) the alleged construction defects were discoverable more than four years before Mahler filed suit; and (2) Mahler actually discovered the deficiencies more than four years before filing suit. Because Mahler pleaded the discovery rule, DMAC bore the burden of proving when Mahler discovered, or should have discovered, the nature of its injuries. *See KPMG Peat Marwick*, 988 S.W.2d at 748.

The discovery rule defers accrual of a claim until the injured party learned of, or in the exercise or reasonable diligence should have learned of, the wrongful act causing the injury. *Cosgrove*, 468 S.W.3d at 36. The discovery rule is limited to "circumstances where 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'" *Id.* (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)). An injury is not inherently undiscoverable when it could be discovered through the

exercise of reasonable diligence. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 66 (Tex. 2011).

It is the discovery of the injury and its general cause, not discovery of the exact cause in fact, that starts the running of the limitations period. *Bayou Bend Towers Council of Co-Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 743 (Tex. App.—Houston [14th Dist.] 1993, writ denied). "Knowledge of injury initiates the accrual of the cause of action and triggers the putative claimant's duty to exercise reasonable diligence to investigate the problem, even if the claimant does not know the specific cause of the injury or the full extent of it." *Exxon Corp.*, 348 S.W.3d at 209.

"The discovery rule may apply to a breach of contract claim, but 'those cases should be rare, as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims.'" *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 543 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (quoting *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 315 (Tex. 2006)). Because contracting parties generally are not fiduciaries, due diligence requires that each party protect its own interests. *Via Net*, 211 S.W.3d at 314.

Of final note, Mahler pleaded its breach of warranty claim under both the common law and the Texas Uniform Commercial Code. The discovery rule does not apply to breach of warranty claims under the Texas UCC, subject to one exception that is not germane to this case. *See* Tex. Bus. & Com. Code Ann. § 2.725(b) (Vernon 2009) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach

7

must await the time of such performance the cause of action accrues when the breach is or should have been discovered."); *Via Net*, 211 S.W.3d at 313 (by enacting section 2.725(b), the legislature has rejected application of the discovery rule in contract cases involving the sale of goods); *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 92 (Tex. 2004) ("The UCC generally requires suit on breach of warranty claims within four years of delivery, regardless of when the buyer discovers defects in the goods. This absolute limitation period was intended to provide a uniform date of accrual beyond which sellers need not worry about stale warranty claims, or retain records to defend against them.").[1]

### 1. Porch roofs

Mahler's original petition identified a number of alleged porch roof deficiencies. Mahler contended that DMAC constructed the porch roofs with inadequate materials and with structural defects including undersized beams, excessive spacing between beams, and inadequate beam supports, such that the porches sagged and were "inadequate to support [their] own weight."

The 2007 report identified six "significant exceptions," described as "some of the more significant of the anomalies noted that have a bearing on [the inspector's] opinion of the quality of workmanship indicated in the building." One of the six "significant exceptions" stated:

> The surface of the roof at the east porch off the reception building was uneven, which corresponded to sags and unevenness at the ceiling

---

[1] Mahler's Texas UCC breach of warranty claims are premised on the same operative facts as its common-law breach of warranty claims. Accordingly, even assuming the provisions of the Texas UCC could be construed to permit application of the discovery rule, we would nevertheless conclude (as we do below) that the discovery rule did not toll accrual of Mahler's claims beyond January 2008, and that Mahler's Texas UCC breach of warranty claims therefore were not timely.

below this area. There was significant sag observed over the barbeque area outside the bar which was abnormal and may be due to structure of insufficient stiffness to prevent the sag. It is recommended that these irregularities be further investigated by the builder to determine the extent of reinforcement necessary for the ceiling structure to prevent further unevenness or deflections.

Sometime after receiving the report in August 2007, Mahler furnished DMAC with a copy of the report and requested DMAC to inspect the porch roofs to determine the cause of the unevenness noted in the report.

Jorden Mahler emailed DMAC in late October 2007 complaining that DMAC had not yet addressed certain items identified in the 2007 report.[2] Jorden noted that "[t]he ceiling under the porches was put up using staples and is starting to have a wave look and has come apart in some areas. Needs to be screwed in."

DMAC performed repairs on the porch roofs in early December 2007. Jorden wrote as follows in a December 11, 2007 email to DMAC:

The porch ceilings have started to have a wave-look to them and were to be corrected. One of ya'lls daily worker guys just showed up last week to start repairing this, but I don't think he knows what he is doing. It's hard sending a guy out who doesn't know how the porches were constructed and expect him to fix the problem. He basically just went around with a box of screws and shot them into the ceiling. Maybe he hit a rafter, maybe he didn't, who knows.

DMAC responded in late December 2007 that "[t]he hardiplank ceiling covering . . . has been tightened up using counter-sunk screws and caulked." DMAC offered Jorden two cosmetic options to fix the "wave-look" of the underside of the porch roofs: (1) finish filling the screw heads flush with caulk and then paint; or (2) "feather float" with ceiling texture and paint, "which will help hide the joints."

---

[2] Jorden Mahler serves as the sole day-to-day manager of Briscoe Manor and is a limited partner in B. Mahler Interests, L.P. Jorden's father, Bill Mahler, is the general partner of B. Mahler Interests, L.P. Together, Jorden and Bill make all decisions regarding Briscoe Manor.

Jorden opted for the "feather float" option. DMAC did not address any underlying structural problem causing the "wave-look."

In January 2008, Jorden sent DMAC an email stating, "I went through my pics from the construction and found these 2 pics of the porches under the construction.....looks like only a 2x4 (header) is what is attached at the building side. I'm not an expert, but looks a little weak." DMAC did not respond to the email, and neither DMAC nor Mahler performed any other investigation concerning the porch roofs until Mahler obtained the 2012 report.

The evidence reflects that Mahler was aware of potential problems with the porch roofs by January 2008 at the latest. The August 2007 report indicated that "[t]here was significant sag observed . . . which was abnormal and may be due to structure of insufficient stiffness to prevent the sag." Jorden testified that, even before the 2007 report was prepared, he was aware of the sag and unevenness in the porch roofs. Likewise, Jorden's January 2008 email to DMAC noting that the porch construction "look[ed] a little weak" is further evidence that Jorden (and Mahler) was aware that a problem might exist sufficient to trigger a duty to exercise reasonable diligence to investigate the problem, even if the problem's full extent was not then known. *See Exxon Corp.*, 348 S.W.3d at 208-09. Mahler provided the 2007 report to DMAC, but Mahler knew that DMAC performed no corrective work regarding the structure of the porch roofs. Mahler chose not to obtain an independent inspection at that time.

The summary judgment evidence establishes that there is no genuine issue of fact as to when Mahler discovered, or through the use of reasonable diligence should have discovered, the allegedly defective porch roofs. The statute of limitations on the porch roof claims began to run in January 2008 at the latest, when Mahler sent the final email to DMAC questioning the roofs' structural

10

integrity. *See, e.g.*, *Booker v. Real Homes, Inc.*, 103 S.W.3d 487, 492-93 (Tex. App.—San Antonio 2003, pet. denied) (statute of limitations began to run when homeowners "were cognizant of problems with the windows leaking even if they were not aware of the possible consequences or the exact cause-in-fact"); *Bayou Bend*, 866 S.W.2d at 743-44 (limitations began to run when party discovered leaks in windows, even if party did not discover cause of leaks until much later but could have done so earlier through use of reasonable diligence).

### 2. Doors

Mahler alleged that DMAC installed interior-grade doors at certain exterior locations. Mahler contended that the doors were represented and warranted by DMAC to be exterior-grade doors.

Jorden testified that he started to notice problems with the doors "shortly after construction" because the doors "weren't shutting correctly, latches weren't lining up with each other, doors were cracking, [and] doors were peeling." Jorden further testified that he "consistently" noticed problems with the doors at issue "[f]rom the beginning," relating back to the original construction in 2006.

These problems prompted Jorden to contact the door manufacturer in April 2007 and request specification sheets for doors that previously had been ordered for Briscoe Manor. The door manufacturer supplied the specifications and stated, "You mentioned the veneer was separating from the wood. I must remind you that any of the doors that are hung in an 'exterior' application carry no warranty. I was very explicit on this with [the DMAC representative]." The specification sheets noted that the doors carried a "Limited 5-year warranty for Interior use," and further stated, "WARRANTY EXCLUDED DUE TO EXTERIOR USE."

11

Jorden also raised concerns about the doors to the inspector performing the 2007 inspection.  The 2007 report notes that "there was concern that the wood exit doors from the buildings were not intended for exterior use, and it was indicated that poor performance of the doors has occurred since they were installed, requiring periodic adjustment of the doors. . . .  It was indicated that an exterior-grade weather resistant finish had been applied at the doors, which appeared to be performing satisfactorily at this time."

Jorden also expressed his concerns about the doors to DMAC.  In an email sent to DMAC on December 11, 2007, Jorden asserted:  "Before the issue of the doors on the exterior being interior doors, I had a cashier's check ready for DM[AC]."  In the same email, Jorden later stated:

> The issue of the exterior doors being hung while they were made for "Interior use" only still bothers me.  This was a stupid decesion [sic] whoevers [sic] it was.  Why would anyone hang an interior door outside in Houston Texas' humidity.

DMAC responded in late December 2007:

> You continually keep bringing up the exterior doors, time and time again, thus labeling them "interior doors."  Do you or Bill [Mahler] have P-lam or metal doors on any or all of your doors at your own home?  Of course not, they are wood!  Solid wood doors that are sealed and either painted or stained and varnished properly are used as "Exterior Doors" as well as metal or glass doors.  If those doors were hollow core doors, that would be different.  They are not!  If you remember, we bought heavy duty marine varnish to add over the manufacture's [sic] coat for longer protective measures.

This evidence establishes that Mahler was aware that the exterior doors were rated as interior doors as early as 2006, and certainly no later than December 2007.  Mahler voiced concerns and complaints about this issue during the same time period.  *See Hixon v. Tyco Int'l, Ltd.*, No. 01-04-01109-CV, 2006 WL 3095326, at

*8 (Tex. App.—Houston [1st Dist.] Oct. 31, 2006, no pet.) (mem. op.) ("'Serious problems' and complaints about those problems generally end the application of the discovery rule because complaints compel the conclusion that the complaining party is aware of a defect.") (citing *Bayou Bend*, 866 S.W.2d at 743). Because the nature of the allegedly defective doors was actually known to Mahler by December 2007, the statutes of limitations on Mahler's door claims began to run at that time.

### 3. Floors

Mahler's original petition alleged that the floors DMAC installed in certain areas of Briscoe Manor were represented and warranted to be commercial-grade floors, but that DMAC actually installed residential-grade flooring. Mahler contends that the flooring began to show signs of wear and tear in fall 2010, and that the flooring deteriorated to the point that Mahler had it replaced in May 2011. Mahler contends it was unaware of the residential-grade nature of the flooring until the installer of the new flooring asked why Mahler previously had installed residential flooring.

The summary judgment evidence established that Mahler was aware that the flooring was a composite material. When Mahler was told by the subsequent flooring installer that the initial floors were residential-grade, Jorden located a box of surplus flooring material that DMAC had left at Briscoe Manor and contacted the manufacturer identified on the box to confirm that the floors were, in fact, residential-grade.

Based on this evidence, we conclude that the injury was not inherently undiscoverable regardless of when Mahler actually discovered it. *See, e.g.*, *Royce Homes, L.P. v. Dyck*, No. 09-06-034-CV, 2006 WL 3094323, at *2-5 (Tex. App.— Beaumont Nov. 2, 2006, no pet.) (mem. op.) (evidence was insufficient to support jury's finding that injury was inherently undiscoverable where builder and

13

homeowners agreed that tinted double-paned windows would be installed but builder actually installed untinted single-paned windows, even though homeowners alleged they did not learn of breach until subsequent contractor informed them of nature of windows). This is not one of the "rare" cases where a contracting party exercising reasonable diligence could not discover the breach during the "relatively long four-year limitations period." *See Via Net*, 211 S.W.3d at 315.

Due diligence required Mahler to protect its own interests. *See id.* at 314. "Due diligence may include asking a contract partner for information needed to verify contractual performance. If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment. But failing to even ask for such information is not due diligence." *Id.* (citations omitted); *see also Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 229 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (same). Jorden testified that DMAC never represented that the floors were commercial-grade once installed; instead, Mahler's claims appear to be based on an unwritten understanding between the parties that the flooring installed would be commercial-grade.

Mahler took no action to confirm that the flooring was of the nature allegedly agreed between the parties until 2011, approximately five years after the flooring was installed. When Mahler did seek to verify DMAC's contractual performance, the only action required was to call the flooring manufacturer identified on the flooring package that DMAC left at Briscoe Manor.

We conclude that the nature of the flooring was not inherently undiscoverable, and that, even if it were, Mahler did not exercise reasonable diligence in protecting its interests and ensuring contractual performance. Accordingly, the discovery rule did not apply to toll the accrual of Mahler's flooring claims.

### 4.    Conclusion

Assuming without deciding that the discovery rule applies to claims such as these, it would not operate to defer accrual of these claims because they were actually discovered, at the latest, by January 2008.  Accordingly, the discovery rule did not make timely Mahler's claims filed in October 2012.[3]  Mahler's third issue is overruled.  We next address Mahler's contention that the doctrines of fraudulent concealment and equitable estoppel tolled the running of limitations.

### B.    Fraudulent Concealment

Fraudulent concealment is based upon the doctrine of equitable estoppel.[4] *Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983).  Fraudulent concealment estops a defendant to rely on the statute of limitations as an affirmative defense when the defendant owes a duty to disclose but fraudulently conceals the existence of a cause of action.  *Id.*

A party asserting fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to the summary judgment motion and to come forward with summary judgment evidence raising a fact issue on each element of the fraudulent concealment defense.  *KPMG Peat Marwick*, 988 S.W.2d at 749.  The party asserting fraudulent concealment must

---

[3] Because we conclude that the discovery rule did not apply to toll the accrual of Mahler's claims, we need not address DMAC's contention that section 13.7 of the AIA construction contract between the parties — titled "commencement of statutory limitation period" — expressly negated application of the discovery rule.

[4] The doctrine of equitable estoppel requires:  (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998).  Because fraudulent concealment is based on the doctrine of equitable estoppel, and because Mahler's equitable estoppel and fraudulent concealment defenses are based on the same alleged conduct by DMAC, we consider them together.

establish that the defendant (1) actually knew a wrong occurred; (2) had a fixed purpose to conceal the wrong; and (3) did conceal the wrong. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011). "Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Marshall*, 342 S.W.3d at 67.

If the fraudulent concealment is based on a fraudulent representation by the defendant, the plaintiff must demonstrate that reliance on that representation was reasonable. *Id.* at 68. Reliance on a fraudulent representation "is not reasonable when information revealing the truth could have been discovered within the limitations period." *Id.*

### 1. Porch roofs

Mahler contends in its second issue that "DMAC failed to Assert Fraudulent Concealment relating to the Porches As 'Grounds' in its Motion." Mahler is mistaken about which party bears the burden of proof regarding fraudulent concealment. As discussed above, the party asserting fraudulent concealment as an affirmative defense to the statute of limitations must raise it in response to the summary judgment motion and come forward with evidence raising a fact issue on each element of fraudulent concealment. *KPMG Peat Marwick*, 988 S.W.2d at 749.

Mahler bore the burden to present proof raising an issue of fact on fraudulent concealment; the burden was not on DMAC to negate fraudulent concealment in its motion for summary judgment. *See id.*; *see also Houston Endowment Inc. v. Atl. Richfield Co.*, 972 S.W.2d 156, 163 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("On summary judgment, the non-movant has the burden to come forward with proof raising an issue of fact on fraudulent concealment."). Mahler's second issue is overruled.

16

In its fourth issue, Mahler contends that a fact question exists concerning Mahler's fraudulent concealment defense. We begin by addressing the fraudulent concealment defense as it pertains to the porch roofs and then consider its applicability to the floors and doors.[5]

We already have determined that Mahler was aware of problems with the porch roofs by January 2008 at the latest. Mahler contends that limitations were tolled on its porch roof claims because it relied on DMAC's statement that the porch roofs had been fixed.

Mahler was aware that DMAC sent "one of its daily workers" to inspect the porch roofs and make repairs, which consisted of adding more screws to the underside of the porch roofs. Because the porch roofs still had a "wave-look," DMAC applied a "feather float" with ceiling texture to even out the ceilings and "help hide the joints." Mahler was aware that DMAC performed no corrective work regarding the underlying structure of the porch roofs.

---

[5] DMAC contends that we need not consider Mahler's fraudulent concealment defense concerning its porch roof claims because Mahler failed to plead in its original petition that DMAC fraudulently concealed any defects with the porch roofs. Mahler did not assert that fraudulent concealment applied to its porch roof claims until its response to DMAC's amended motion for summary judgment. DMAC objected to and secured a favorable ruling excluding an amended petition Mahler filed the day before the hearing on the motion for summary judgment that asserted fraudulent concealment as to the porch roof claims; DMAC did not object to Mahler raising the issue in its summary judgment response. *See Mitchell v. Methodist Hosp.*, 376 S.W.3d 833, 836 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("The Mitchells, however, did not plead fraudulent concealment as a matter in avoidance of Methodist's limitations defense, and Methodist objected to the Mitchells raising fraudulent concealment in their summary judgment response. Because it is a matter in avoidance of the defense of limitations that was not pleaded, we do not consider the Mitchells' fraudulent concealment argument."). DMAC tried the issue by consent when it addressed the issue in its reply. *See Haase v. Abraham, Watkins, Nichols, Sorrels, Agosto and Friend, LLP*, 404 S.W.3d 75, 86 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("An unpleaded plea in avoidance may still serve to preclude summary judgment if it is raised in a summary judgment response and if the opposing party fails to object to it in a reply or before the rendition of judgment.").

17

After DMAC performed the "repairs" and allegedly stated that the problem was fixed, Jorden sent an email to DMAC in January 2008 questioning the structural integrity of the porch roofs and stating that it "looks like only a 2x4 (header) is what is attached at the building side. I'm not an expert, but looks a little weak." DMAC did not respond to Jorden's email.

In light of Mahler's knowledge concerning the actions DMAC took to inspect and repair the porch roofs, Mahler's reliance on DMAC's statement that the issue had been resolved was not reasonable. *See Shell Oil Co.*, 356 S.W.3d at 927-28 (rejecting argument "that reasonable reliance on fraudulent representations negates any duty to investigate unless and until further information comes to light which re-triggers that duty"). This is especially true in light of Mahler's structural concerns expressed after the porch roofs allegedly were repaired, when Mahler knew that DMAC performed no structural repairs.

Additionally, Mahler has failed to present evidence raising a fact issue that DMAC knew of the alleged wrong or acted with a fixed purpose to conceal the alleged wrong. *Brent v. Daneshjou*, No. 03-04-00225-CV, 2005 WL 2978329 (Tex. App.—Austin Nov. 4, 2005, no pet.) (mem. op.), considered a similar situation:

> Similarities to *Ryland* [*Group, Inc. v. Hood*, 924 S.W.2d 120 (Tex. 1996)] and *Bayou Bend* [*Towers Council of Co-Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740 (Tex. App.—Houston [14th Dist.] 1993, writ denied)] lead us to conclude that the record in this case does not contain the evidence necessary to show a fact issue regarding willful misconduct or fraudulent concealment of flaws in the original construction. Construing the evidence most favorably to Brent, the record shows that Daneshjou built the house in ways that made it susceptible to admitting and retaining water, leading to rot and mold. But there is no evidence of improper intent. Evidence shows that Daneshjou cut corners to save money, but it does not show that he did so knowing that those measures rendered the house deficient or

dangerous or risked doing so. Nor is there evidence that, in building or repairing the house, he acted with the intent to conceal these wrongs. As in *Booker* [*v. Real Homes, Inc.*, 103 S.W.3d 487, 492-93 (Tex. App.—San Antonio 2003, pet. denied)], there is evidence that Daneshjou represented that the problems were fixed. *See Booker*, 103 S.W.3d at 494 (builder represented that leaks were repaired and that musty smell came from outside). But, unlike in *Booker*, there is no evidence here of intentional malfeasance and misinformation; in *Booker*, the builder told another contractor not to finish the repairs, but represented to the plaintiffs that the repairs were complete and accepted a payment for all the repairs-including work not performed. *See id.* There is no evidence that Daneshjou committed willful misconduct while building the house, nor is there evidence that he guided construction and repairs intending to conceal any misconstruction or intentionally misled Brent through information or misinformation intending to conceal any misconstruction.

*Id.* at \*6.

As in *Brent*, the evidence before us suggests that DMAC's porch roof construction may have been defective, but does not show that DMAC knew the construction was defective. *See id.*; *see also Shell Oil Co.*, 356 S.W.3d at 927 (fraudulent concealment doctrine requires proof that the defendant actually knew a wrong occurred). Nor does the evidence show an intent or "fixed purpose" by DMAC to conceal the wrongs when it made its repairs. *See Shell Oil Co.*, 356 S.W.3d at 927; *Brent*, 2005 WL 2978329, at \*6 ("Nor is there evidence that, in building or repairing the house, he acted with the intent to conceal these wrongs."). While DMAC may have told Mahler that it had fixed the problem, there is no evidence that it knew the representation to be false. *See Brent*, 2005 WL 2978329, at \*6. Accordingly, Mahler failed to present evidence establishing its fraudulent concealment defense to limitations. *See id.*; *Bayou Bend*, 866 S.W.2d at 746-47 (concluding "Bayou Bend did not establish that appellees acted with a fixed purpose to conceal Bayou Bend's cause of action," even though Bayou Bend

19

alleged that appellees were aware of construction defects "from the very beginning").

## 2.  Doors and floors

Jorden testified that nobody at DMAC ever lied to him about the doors or floors.  Jorden further testified that nobody at DMAC ever said the floors were commercial-grade floors, or that the doors were warranted for use in an exterior application.

With respect to the doors, Mahler now contends that, "[c]ontrary to Mr. Mahler's mistaken deposition testimony, DMAC representatives indeed represented to Mahler and convinced Mahler that the doors installed were appropriate and of good quality."  But Mahler was aware as early as 2006 that interior-grade doors had been used, and was certainly aware of the issue by December 2007 when he emailed DMAC stating that "[t]he issue of the exterior doors being hung while they were made for 'Interior use' only still bothers me.  This was a stupid decesion [sic] whoevers [sic] it was.  Why would anyone hang an interior door outside in Houston Texas' humidity."  Because Mahler was aware that the doors were interior doors, its claim can be only that DMAC fraudulently concealed from Mahler that the interior doors would not perform as indicated in an exterior location.

Mahler has failed to demonstrate that DMAC knew the doors were not appropriate and of good quality.  The summary judgment evidence demonstrates the opposite — DMAC's email shows that it believed the doors in question would function well as exterior doors with proper protective measures:

> You continually keep bringing up the exterior doors, time and time again, thus labeling them "interior doors."  Do you or Bill [Mahler] have P-lam or metal doors on any or all of your doors at your own

20

home? Of course not, they are wood! Solid wood doors that are sealed and either painted or stained and varnished properly are used as "Exterior Doors" as well as metal or glass doors. If those doors were hollow core doors, that would be different. They are not! If you remember, we bought heavy duty marine varnish to add over the manufacture's [sic] coat for longer protective measures.

Moreover, Mahler's reliance on DMAC's statements was not reasonable when "the truth could have been discovered within the limitations period." *See Marshall*, 342 S.W.3d at 68. Mahler could have contacted the door manufacturer, another contractor, or an inspector to determine if the interior-grade doors, properly maintained, could adequately serve as exterior doors. Because it did not, the fraudulent concealment doctrine did not toll the running of limitations on its door claims.

With respect to the floors, Mahler contends that no explicit misrepresentation was made, but rather that DMAC concealed the residential nature of the flooring by its silence. "[S]ilence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). DMAC, as a contracting party in an arms-length transaction with Mahler, had no duty to disclose that the floors were not commercial-grade. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 98 (Tex. 2004) ("It is true there was evidence PPG knew far more than it was telling anyone about the Twindows'[sic] defects. But mere silence is not fraudulent unless there is a duty to disclose; no such duty existed between these contracting corporations."); *Bayou Bend*, 866 S.W.2d at 747 ("[A]ppellees owed Bayou Bend no duty to disclose because there was no fiduciary relationship between the parties.").

Moreover, the allegedly concealed residential nature of the flooring could have been discovered by Mahler any time after installation of the floors had Mahler exercised reasonable diligence. The flooring materials were left at Briscoe Manor in a box bearing the manufacturer's information. When Mahler sought to confirm that the floors were not commercial-grade floors, it simply located the box of flooring and called the manufacturer. Accordingly, the fraudulent concealment doctrine does not toll the running of limitations on Mahler's floor claims.

Having concluded that the doctrines of fraudulent concealment and equitable estoppel did not apply to toll Mahler's claims, we overrule Mahler's fourth issue.

## CONCLUSION

Having overruled Mahler's second, third, and fourth issues, we conclude that the trial court properly granted DMAC's traditional motion for summary judgment. Because summary judgment was proper on DMAC's traditional grounds, we need not reach Mahler's first issue contending that summary judgment was improperly granted on no-evidence grounds. Accordingly, we affirm the judgment of the trial court.


/s/ William J. Boyce
   Justice


Panel consists of Chief Justice Frost and Justices Boyce and Wise. (Frost, C.J., concurring).